**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 5 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

GREGORY C. WATTS,

    Plaintiff - Appellant,

v.

THE CITY OF NORMAN, a political
subdivision of the State of Oklahoma,

    Defendant - Appellee.

No. 00-6208

---

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 99-CV-1235-T)**

---

Ken Feagins (with Stanley M. Ward, and Woodrow K. Glass on the briefs) of
Norman, Oklahoma, for the appellant.

Rickey J. Knighton, II (with Jeff H. Bryant and Jeff F. Raley on the brief) of
Norman, Oklahoma, for the appellee.

---

Before **TACHA,** Chief Judge, **GIBSON,**[*] and **LUCERO**, Circuit Judges.

---

**JOHN R. GIBSON,** Circuit Judge.

Gregory C. Watts appeals from the district court's entry of summary

judgment against him in his employment discrimination suit against the City of

---

[*] The Honorable John R. Gibson, Circuit Judge, United States Court of Appeals for
the Eighth Circuit, sitting by designation.

Norman, Oklahoma.  Watts, who terms himself an Afro-American, was a captain in the Norman fire department when he became involved in a physical confrontation with one of his subordinates, whom Watts describes as Caucasian. After this incident, the department disciplined Watts by demoting him from captain to firefighter.  Watts retired rather than accept the demotion.  He sued the City under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5 (1994) and 42 U.S.C. § 1981a (1994), alleging that the City terminated his employment on account of his race.  The district court held that Watts did not come forward vbwith evidence that the City's announced reason for demoting him was a pretext for racial discrimination.  The court therefore entered summary judgment for the City.   Watts contends that he did show pretext by showing that the department failed to apply the same discipline it meted out to him to the Caucasian subordinate who was involved in the incident.  We affirm.

In this procedural posture, we recite the version of the facts most favorable to Watts.

When Watts began work for the Norman fire department in 1976, certain co-workers told him that other members of the Norman fire department would not work with him because of his race and that they would make racist remarks.  Also at that time, Watts heard the use of the word "nigger" at the fire station, and he

heard it once at a retirement party. At his deposition in this case, Watts did not testify about any such events occurring within the last ten years.

The City's decision to demote Watts arose out of the events of October 31, 1998. About seven o'clock that morning, firefighter Charles Wilson complained to Watts about Watts's personal use of the station laundry facilities. According to a written narrative Watts made later that day, the exchange was already acrimonious. Watts wrote, "[S]hortly after 7am, Firefighter Chuck Wilson viciously and virulently, verbally blew up at me in the rear bedroom by the washing/drying machines." Watts also described Wilson's speech in the bedroom as a "vile barrage of words." Wilson said, in crude language, that Watts was annoying him and "everyone" else.

Watts left the bedroom and prepared to shave, but before shaving he went to ask two other firefighters about what Wilson said. According to Watts, "To better gauge this incident, I briefly inquired about how I was operating the Station with two other 'A' Crew Firefighters, Brian Starkey and Paul Harvey. . . ."

Then Watts shaved, "while reflecting on what had transpired," as he said.

At eight o'clock, an hour after the first incident, Watts again looked up Starkey and Harvey, to talk more with them about Wilson's assertion that Watts was annoying everyone. Watts said,

> Due to the hot temper and ill will displayed by Firefighter Wilson, at
> 8:00 am I asked Firefighter Starkey and then Firefighter Harvey to

-3-

visit with me one at a time in the truck room. To avoid tunnel vision and to keep a broad and flexible perspective, I asked each one for their observations of how I was operating the Station.

Watts next asked Wilson to come talk to him in the truck room of the station. Wilson did not come. After waiting a while, Watts went and asked Wilson again to come to the truck room. Still Wilson did not come. Watts sent Starkey and Harvey to ask Wilson to come. When Wilson still did not come, Watts said he went to Wilson and "told him in a clear and precise cuss language that he should comply." Wilson did not.

Watts decided to have his talk with Wilson on the spot. Watts began to pace, which according to other testimony was a habit of his. According to Watts, Wilson began to imitate his pacing:

> I used Civility, Patience and Empathy as I paced back and forth.
> Firefighter Wilson then began to mimic my pacing in a bizarre and erratic fashion, with a stooped-over posture and to imitate my attempts to have him communicate with me about how I was running the station. This temper tantrum display continued for a few minutes.
> As I stopped pacing and stood still, Firefighter Wilson started ranting and raging in a loud contemptible voice reflected with an exaggerated facial expression, about how he felt I was paranoid. He then came in front of me, stopped mimicking my pacing, and stood up erect.
> Finally, he got in my face about one foot distance, squared off, never answering the root question of how he felt I operated the station and continued to argue.
> Without warning Firefighter Wilson viciously head butted me. He stuck his forehead into my forehead and continued to aggressively lean into me. The head butt sounded loud and for an instant I saw

-4-

stars. With no premeditation, I instinctively removed his head from my face with my opened right hand, protecting myself, and did not follow up with further re-action to being struck on my forehead by Firefighter Wilson.

Wilson immediately telephoned Assistant Fire Chief Johnny Vaughn. Vaughn came to the station to investigate. The first thing Vaughn did was talk to Watts. Vaughn testified in his deposition that Watts began talking about defending himself. Vaughn testified:

> And all of a sudden–and I am not positive about what it was that Greg said that triggered my thought pattern, but I asked–I said, "Greg, what have you done here? Did you hit him?"
> And by this time, even in the conversation, Greg was very upset. He was mad. And it was something to the nature of doing his hands like this (indicating) clapping real loud. And he said, "You goddam right. Right up side his head."

Vaughn testified that Watts claimed Wilson had butted his head, but Vaughn observed that "Captain Watts didn't show any redness or a knot or anything else to where I could be sure that he had been head-butted." At this point, Vaughn decided that Watts was too agitated to run the fire station that day, so he sent him home for the day. Vaughn asked Watts to provide him with a written statement about the incident, and Watts provided two different statements (which formed the basis for the foregoing statement of facts).

Next, Vaughn interviewed Wilson. Vaughan understood that Wilson had a reputation of being "about half hard to get along with" and that he was "one of the guys that will fly off the handle real fast." According to Vaughn, Wilson said

that he and Watts "got into it about the laundry." Then Wilson either said that Watts had slapped him or that he had punched him–at his deposition, Vaughn wasn't sure which Wilson had said. Vaughn could see that the left side of Wilson's face was swollen and red down to his ear. He told Wilson that Watts said Wilson butted him in the head, and Wilson denied this, saying that although their heads were close, he did not touch Watts. Vaughn decided Wilson was also too agitated to stay at work, so he sent him home. Wilson, too, provided a written statement of his side of the story. Vaughn mentioned that in his written report, Wilson stated that the two men's foreheads "may have touched." (Wilson's report actually says that Watts advanced on Wilson, who stood his ground so that "our foreheads touched, eyeball to eyeball.")

Vaughn also requested written reports from Firefighters Harvey and Starkey. Their accounts were very similar. Both said that Watts had approached them at about 6:50 a.m. to ask if they had a problem with him doing his laundry while on duty. Starkey said Watts was "in a very agitated state and seemed extremely upset." Both said Watts came back later to ask if they had complaints about how Watts ran the station. Later, Watts came looking for Wilson while they were with him, and Watts told them to leave. As they left, they saw Watts come very close to Wilson, shouting. Harvey wrote: "As I was walking off I saw Greg jump into Chuck's face and at the top of his lungs yell to Chuck, 'I'm

fucking in charge here. You're not fucking in charge.'" Starkey wrote, "Before turning and leaving, I saw Greg step very close to Chuck and did what I would describe as ranting and raving, flailing his arms and screaming obscenities. The best I can recall, Greg said, "I'm running this f... place you cocksucker." Both men said that they rounded the corner at that point and therefore could no longer see Watts and Wilson, but that they heard a loud slap. Both men also said that when they saw Wilson a short time later, Wilson asked if they had seen Watts hit him. They said that Wilson's face was "very red and puffy," "from his ear down the whole side of his cheek."

Wilson was assigned to another station while the department investigated the incident. Vaughn concluded that it was impossible to say which of the two men was the aggressor since there were no third-party witnesses and the two antagonists had contradictory stories: "It was his word against his word." Vaughn conveyed to the Fire Chief, John Dutch, the results of his investigation, consisting of his memorandum and the written statements of Watts, Wilson, Harvey, and Starkey. Vaughn's personal opinion was that both Wilson and Watts should be dismissed because "the rules and regulations of our fire department stated that no firefighter would ever strike another under any circumstances. It doesn't address captain, firefighter, or anything else. It's just no firefighter shall have an altercation." However, Fire Chief Dutch's decision was that Wilson

would not be disciplined because the department could not prove "through statements or visuals or anything else, about the head-butt."

There was a pre-disciplinary hearing to consider Watts's case, attended by Watts and his attorney, a city attorney, a city personnel employee, the union president, Fire Chief Dutch and Vaughn. After the hearing, Fire Chief Dutch submitted a memorandum to the city personnel director, George Shirley, proposing that the City terminate Watts's employment. Dutch wrote:

> In summary, it is my finding that Captain Watts did verbally abuse a subordinate, using loud, offensive, profane, and vulgar language; that Watts did direct physically aggressive movements toward a subordinate; that Watts' actions have, in fact, intimidated and frightened employees in the Fire Department; and that Watts did physically strike a subordinate employee.

Shirley concurred with Dutch's decision. Dutch's proposal was subject to further review by city Manager Ron Wood.

Wood determined that Watts should be disciplined, but that the discipline should be demotion from captain to firefighter, rather than termination of employment. Wood wrote in a letter to Watts that the decision to discipline him was based on two grounds: first, the evidence that Watts struck a subordinate was very strong, while Watts's claim of self-defense was not corroborated, despite investigation; and second, regardless of who made the "initial contact," Watts failed in his duty as a supervisor by allowing the conflict to escalate to the point of violence, rather than simply sending Wilson home. Despite the gravity of

Watts's conduct, Wood concluded that in light of Watts's long record of service with the City, demotion to a non-supervisory position, rather than firing, was the appropriate sanction.

Watts resigned rather than accept the demotion. He brought this suit against the City, alleging discriminatory termination of his employment on account of his race, in violation of Title VII, 42 U.S.C. § 2000e-2(a) (1994).

The City moved for summary judgment. Proceeding under the McDonnell Douglas[1] framework, the District Court held that Watts had made a prima facie case. The Court concluded that Watts was a member of a protected class, that he suffered the adverse employment action of being demoted, and that he had performed his job satisfactorily up until the incident with Wilson. The Court recited as one element of the prima facie case the requirement that "similarly situated white employees were treated more favorably." Slip op. at 4 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). After the date of the district court's decision, we clarified that the fourth element of the prima facie case does not require comparison with a person outside the protected class. See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1229 (10th Cir. 2000). However, the district court did not discuss whether Watts had shown evidence on

---

[1]McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Watts initially pled a mixed-motive case in the alternative, but on appeal he does not argue that we should apply a mixed motive analysis or that he has presented direct evidence of discrimination.

this element. Instead, the district court moved on to hold that the City had borne its burden of producing a nondiscriminatory reason for disciplining Watts in that he had hit a subordinate employee in the course of his employment and had used profane and abusive language, in violation of department policy. Slip op. at 6-8.

To establish pretext, Watts relied on earlier instances of racially offensive language used within the department in the past and on the difference in the City's treatment of him and Wilson for their participation in the dispute. The district court held that the earlier instances of improper language were too remote in time to be relevant and had no causal connection with the disciplinary action. Slip op. at 13. The failure to discipline Wilson did not show discriminatory intent, the court held, even assuming the truth of Watts's contention that Wilson was the aggressor. The court stated that the critical question was whether the City had honestly believed in the reason it gave for disciplining Watts, not whether the factfinding underlying its reasoning was accurate. Slip op. at 14. The court concluded that there was no evidence that the City's proffered reason for disciplining Watts was a pretext for discrimination, and so it entered judgment for the City. Id.

We review de novo the district court's grant of summary judgment, applying the same legal standards appropriate for the district court. Kendrick, 220 F.3d at 1225. Summary judgment should be granted "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding whether the moving party is entitled to summary judgment, we must view the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor. Kendrick, 220 F.3d at 1225.

For this appeal, the City does not dispute that Watts presented a prima facie case, and Watts does not dispute that the City articulated a legitimate, nondiscriminatory reason for disciplining him. Therefore, the only issue presented on appeal is whether there is evidence of pretext--in other words, evidence that a discriminatory reason more likely motivated the City or that the reason the City gave for its treatment of Watts was unworthy of belief, see Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1317 (10th Cir. 1999).

One of the established methods of proving pretext is to show that the employer treated the plaintiff "differently from other similarly-situated employees who violated work rules of comparable seriousness." Kendrick, 220 F.3d at 1230; English v. Colorado Dept. of Corrs., 248 F.3d 1002, 1011 (10th Cir. 2001). Watts argues that he showed pretext by showing that the City did not discipline Wilson for violating the rule against fighting. Watts bears the burden of establishing that

he and Wilson were similarly situated.  Kelley v. Goodyear Tire & Rubber Co.,

220 F.3d 1174, 1178 (10th Cir. 2000).

The City responds that Watts and Wilson were not similarly situated

because Watts was a supervisor and therefore had a greater responsibility not only

to avoid fighting, but to actively defuse the explosive situation before it escalated

into violence.  Under our precedent, employees may not be "similarly situated"

when one is a supervisor and the other is not.  In Jones v. Denver Post Corp., 203

F.3d 748, 752-53 (10th Cir. 2000), an employee was disciplined for using his

employer's telephone for outside business.  He attempted to prove pretext by

showing that his supervisor also used the telephone for outside business and was

not disciplined for doing so.  We held that the comparison was not "legally

relevant" because non-supervisory and supervisory employees "cannot be deemed

similarly situated in a disciplinary matter such as this one."  Id. at 753.

The distinction between supervisors and non-supervisors is clearly relevant

to whether we would expect the employees in this case to be treated the same in

the absence of discrimination. An employer who entrusts greater authority to its

supervisors than to ordinary employees surely can be expected to exact greater

responsibility from them. Supervisors often have to manage difficult employees.

The record in this case shows that the City had heightened expectations of its

supervisory employees and also gave them authority to neutralize a deteriorating

situation by such measures as sending a subordinate home. City Manager Wood explained the City's decision to demote Watts largely in terms of his failure to recognize and defuse an explosive situation. Wood wrote:

> [F]ocusing solely on who made the initial contact confuses the primary issue in this matter.
>
> For a Supervisor to allow these events to escalate to a point of physical contact, in my view, is a complete mishandling of the situation. This method of supervision cannot be tolerated in this organization. As a supervisor, you should have looked for ways to diffuse the situation rather than yelling in the employee's face and escalating the confrontation. One option available to you as a Supervisor would have been making sure the direct order was clear, and then relieving the employee from duty with pay pending a recommendation for disciplinary action with review by your superiors. Your handling of this situation culminating in a physical confrontation with the subordinate is egregious, unacceptable, and would normally warrant termination from employment.

Wood said that while Watts's long record of service and lack of prior disciplinary problems argued in his favor, "it does concern me that even in our meeting on January 8, that you failed to recognize that you mishandled the situation as a Supervisor and continue to claim that you are the 'victim.' I have no confidence in your continuing in a supervisory capacity with the City of Norman."

Regardless of who hit whom, Watts's own statements gave the City reason to conclude that Watts escalated a situation rife with potential for violence and in fact used his position as supervisor to do so. Watts's narrative statement describes Wilson as intensely hostile at their first encounter at 7:00 a.m. Watts

-13-

said Wilson "viciously and virulently, verbally blew up at me" and launched a "vile barrage of words." Watts says that he was aware that Wilson was subject to "mood swings." Watts left the room and went to shave. At 8:00 a.m. he looked up Starkey and Harvey to talk about the laundry room incident. Next, he ordered Wilson to come talk to him. When Wilson did not come, Watts ordered Starkey and Harvey to tell him to come. Next, Watts went personally to tell Wilson in "cuss language" that he should comply with Watts's order. Wilson still would not obey, so Watts went to him to engage him in a discussion. Taking Watts's narrative at its word, it should have been clear by that time that Watts and Wilson were not about to have a constructive exchange. Watts said that Wilson engaged in a "temper tantrum" that continued for a "few minutes." He said Wilson then began "ranting and raging in a loud contemptible voice reflected with an exaggerated facial expression." Watts contends he was still trying to engage in a conversation with Wilson as Wilson "got in my face about one foot distance, squared off, never answering the root question of how he felt I operated the station and continued to argue." Only after this protracted warm-up did Wilson finally butt Watts, according to Watts's statement. Taking the facts from Watts's own statement, it appears that Watts failed to short-circuit a potentially violent dispute by sidelining a subordinate who had become unhinged. Further, he used

his position as supervisor to gain the chance to be alone with Wilson and to continue their dispute, despite evidence that Wilson had lost control of himself.

Watts's managerial failure fundamentally distinguishes his situation from Wilson's. After all, the challenged discipline here was to reduce Watts to Wilson's rank. Because of the difference in their positions of employment, we cannot hold that Watts and Wilson were similarly situated or that the City's decision to discipline only Watts is proof of pretext.

The City further relied on another crucial difference between the two cases in making its decision to discipline Watts and not Wilson--the qualitative difference in the proof against the two men. Watts contends that we are bound at this procedural stage to hold the City responsible in accordance with his version of the facts. Although we are, of course, bound to view the facts in the light most favorable to the non-movant, Watts misconceives which facts are relevant. Regardless of what really happened between the two men, in judging the City's response, we must evaluate the facts available to the City at the time of its decision. In determining whether the proffered reason for a decision was pretextual, "we examine the facts 'as they appear to the person making the decision.'" Selenke v. Med. Imaging of Colorado, 248 F.3d 1249, 1261 (10th Cir. 2001) (quoting Kendrick v. Penske Transp. Servs., 220 F.3d at 1231).

-15-

The City investigated the incident thoroughly before making any decision, holding a pre-disciplinary hearing at which Watts was represented by counsel. The City had the statements of Starkey and Harvey that an agitated Watts sought out Wilson and sent them away so he could be alone with Wilson; that Watts was shouting obscenities at Wilson; that they heard a slap; and that Wilson's face was red and swollen immediately afterwards. The City had Vaughn's evidence that Watts had admitted striking Wilson in the head, that Watts had no marks of a blow on his head, and that Wilson's face was red and swollen. The City had conflicting statements by Wilson and Watts, each claiming the other hit him and each denying hitting the other. City Manager Wood concluded:

> It cannot reasonably be disputed that you, the Supervisor, struck a subordinate during the exercise of your authority as a Supervisor. This is clear from the events that led up to the confrontation, the observations of the other employees, the sound of physical contact heard by the other employees, the redness of the face of the subordinate, and by your own admission.

On the other hand, the City lacked objective evidence that Wilson had struck Watts. Whereas Vaughn reported that Watts admitted striking Wilson, Wilson always denied striking Watts. City Manager Wood wrote to Watts, "There is no corroborating evidence to support your claim that you were head butted such as a bruise or swelling or observation by other employees. Whether you were head butted by the subordinate appears to be your word against the subordinate's word." Fire Chief Dutch decided not to discipline Wilson because the City could

-16-

not prove he struck Watts "through statements or visuals or anything else," except, of course, for the word of his antagonist.

Importantly, while Watts contends that his version of the story is correct and Wilson's is false, he does not dispute the City's account of the state of the evidence before it. Nor does Watts fault the City's investigatory methods. He only faults the City's determination of appropriate discipline for the two men, arguing that Watts had a "23 year spotless track record with the City" and Wilson had a reputation for "fly[ing] off the handle." This Court has no need and no authority to determine what really happened between the two men or what discipline would have been appropriate to each. See Selenke, 248 F.3d at 1261 (court may not second-guess employer's business judgment); Bullington, 186 F.3d at 1318 & n.14 (court's role not to determine if employer's decisions "wise or fair," but whether they were discriminatory). Our task in this case is only to say whether the men were "similarly situated" so that the City's different disposition of their two cases is evidence of pretext. The existence of corroborating evidence in Watts's case and the absence of such evidence in Wilson's case is a crucial difference from the point of view of an employer trying to decide what disciplinary measures it ought to mete out to the respective employees and, for that matter, what actions it could later defend if challenged by the disciplined employee. Wilson was therefore not similarly situated to Watts, and the Wilson

-17-

case therefore does not provide the pretext evidence Watts needs. See Kendrick, 220 F.3d at 1232-34 (where undisputed facts indicate substantial difference in circumstances, different treatment is not evidence of pretext); Kelley, 220 F.3d at 1178-79.

Watts argues briefly that the evidence of racially offensive language within the department in the past should be considered evidence that the discipline decision was discriminatory.

There is evidence in the record from three Afro-American municipal employees about racist language: Watts; George Shirley, the City's personnel director; and Fred Henderson, another firefighter. At his deposition, Watts did not testify about any such language being used within the last ten years. He said that in 1976, when he started work, one person told him he would have to endure racist remarks and hostility. At the same time, another person told Watts that the persons occupying the tailboard position on the firetrucks called themselves the "nigger tailboardmen," whether they were black or white. Still a third person referred to Oklahoma City as "nigger town" and "made mention of using that type of language to run the station." According to Watts, when the phrase "nigger town" was used at a retirement party, a former fire chief noticed Watts walking away from the conversation. Watts said that "Chief Akin took the time to come over and say, 'These things are going to happen. Don't let it get next to

-18-

you.'" At his deposition, Watts testified that this incident happened more than ten years ago.

Henderson said in an affidavit that a captain called him a "nigger boy" in 1985, but that he objected to the captain at the time and has not heard such insults since then.

Shirley testified that when he was hired in the mid-seventies, the then-City Manager told him he would encounter a racist environment, but that if anything happened to him personally, he should bring it directly to the City Manager. Shirley testified: "[H]e said that so I would understand that he would support me."

The Supreme Court in <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 151-53 (2000), emphasized the relevance of conduct showing discriminatory attitudes by the decisionmaker preceding the challenged decision. The Court held that such conduct was important evidence even though it was not made in the direct context of the challenged firing. <u>Id.</u> at 152-53. However, Watts's evidence of ambient racism in the department and the City falls far short of proving pretext, for reasons that are still valid after <u>Reeves</u>: the specific incidents were remote in time, dating from many years before the decision at issue in this case; they did not involve wrongdoing by anyone who participated in the challenged decision (although Shirley, a decisionmaker, was warned he might

be subjected to racism, which cuts against the idea that he would condone racist treatment of Watts); the racist language was not addressed to Watts; and the comments had no bearing on ability to perform the job in question. See English, 248 F.3d at 1010 ("Isolated, racist remarks by co-workers are insufficient" to establish discrimination in firing); Heno v. Sprint/United Management Co., 208 F.3d 847, 856 (10th Cir. 2000) (court admitting anecdotal evidence of discrimination should "scrutinize the time frame" and look for nexus to adverse employment action); Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1210 (10th Cir. 1999) (plaintiff must show nexus between statements and decision to fire); Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance Abuse, 165 F.3d 1321, 1330-31 (10th Cir. 1999) (incident not similar for pretext purposes because of three years' time lapse); Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 531 (10th Cir. 1994) (isolated comments insufficient to show discrimination where speaker was not involved in making allegedly discriminatory decision and comments were not about plaintiff).

Because the City's announced reason for disciplining Watts was failure to live up to responsibilities which were not a part of Wilson's job, and because the evidence available to the City about the two men's misconduct differed qualitatively, different treatment of the two men does not amount to evidence of pretext. Nor does Watts adduce other evidence sufficient to carry his burden of

proving that his demotion was based on intentional discrimination.  See Reeves,

530 U.S. at 143.  We must affirm the district court's entry of summary judgment

against Watts.