**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 13, 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PATRICK J. MITCHELL,

      Plaintiff-Appellant,

      v.

CITY OF WICHITA, KANSAS;
RONALD J. WEST, individually and
in his official capacity as Captain of
the Wichita Police Department;
NORMAN WILLIAMS, individually
and in his official capacity as Deputy
Chief of Police of the Wichita Police
Department; MICHAEL D. WATSON,
individually and in his official
capacity as Chief of Police of the
Wichita Police Department; CHRIS
CHERCHES, individually and in his
official capacity as City Manager of
the City of Wichita; JAMES
CARNEY, individually and in his
official capacity as a Captain of the
Wichita Police Department,

      Defendants-Appellees.

No. 04-3199

(D.C. No. 99-CV-1150-MLB)

(D. Kansas)

---

**ORDER AND JUDGMENT** *

---

*This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Before **EBEL**, **TYMKOVICH**, Circuit Judges, and **BROWNING**, District Judge.[**]

Plaintiff-Appellant Patrick J. Mitchell appeals from the district court's grant of summary judgment affirming the Wichita Police Department's ("WPD") decision to terminate Mitchell from his position as a WPD lieutenant. Mitchell raises three issues on appeal: (i) whether Mitchell presented direct evidence of discrimination; (ii) whether there was sufficient evidence to establish a prima facie case of reverse discrimination under Notari v. Denver Water Dep't, 971 F.2d 585 (10th Cir. 1992); and (iii) whether Mitchell created a genuine issue of material fact that the Defendants violated his right to equal protection under the law. This Court has jurisdiction under 28 U.S.C. § 1291.

## FACTUAL BACKGROUND[1]

On August 11, 1986, Mitchell, a Caucasian, joined the WPD. He started as a patrol officer, and, after a series of promotions, became a lieutenant in 1996. As a lieutenant, Mitchell had supervisory responsibilities. The supervisor to whom Mitchell reported directly, Captain James Carney, described Mitchell's

[**]The Honorable James O. Browning, District Judge, United States District Court for the District of New Mexico, sitting by designation.

[1]As evidenced by the lengthy factual sections in the parties' briefing, there are numerous factual disputes in this case. The district court recognized this and provided a coherent description of all material facts. This Court will thus not discuss all the factual disputes that may exist, but will focus on those facts that are material to the legal issues raised in this appeal.

work performance as "above average."  Deposition of James Carney at 109:11 (taken June 19, 2001)(hereinafter "Carney Depo.").

Mitchell began dating Denise Wise, an African American, who worked as a clerk in the WPD's Record Section.  As a records clerk, Wise held a position with no supervisory responsibilities.[2]  Mitchell and Wise broke up in June of 1997, after dating for over one year.

On July 3, 1997, approximately three weeks after their sexual relationship ended, Mitchell had another woman over to his apartment, Debbie Hernandez. That night, Wise, pregnant with Mitchell's child, showed up at Mitchell's apartment.  After Mitchell refused to open the door, Wise entered the apartment anyway, apparently with her own key.  The district court found that "words were exchanged between all those present[,] [but] [t]he record is unclear whether any physical altercation occurred."  Memorandum Opinion and Order at 3.  There is, however, no dispute that an incident transpired that evening which triggered Mitchell's criminal and internal affairs investigations ("Wise incident").[3]

---

[2]Mitchell contends that Wise is "very active" in the National Association for the Advancement of Colored People ("NAACP").  The Defendants challenge this assertion, contending that there is no evidence in the record to support it. Mitchell cites to two pages of his own deposition.  One page does not refer to Wise's involvement in the NAACP; the other page contains Mitchell's testimony that Wise was involved with the NAACP.  Mitchell thus provides no other support for this assertion.

[3]The Defendants contend that a physical altercation occurred, resulting in
(continued...)

On July 4, 1997, Carney learned about the incident between Mitchell and Wise. Carney met with Norman Williams, WPD Deputy Chief, and Paul Dotson, WPD Investigations Unit Captain, to discuss how to proceed with the situation. Williams suspended Mitchell with pay pending the investigation into the incident.[4]

---

[3](...continued)
Wise being hospitalized. To support this contention, the Defendants cite to Mitchell's deposition, in which he states that Wise "threatened and assaulted" him, and to Wanda Parker-Given's deposition. Neither of these excerpts describe a physical altercation in any detail. The portion of Hernandez' deposition to which the Defendants cite for the proposition that Hernandez was in the apartment at the time Wise arrived, however, contains a description of Wise and Mitchell being in a physical altercation, in which he pushed her against the wall and on the bed, as well as restrained her at the wrist, in an attempt to stop her from hitting him. Moreover, although the district court did not make a finding on this matter, Mitchell did not dispute W. Michael Watson, WPD Chief of Police, and the City of Wichita's assertion that, as a result of the July 3rd incident, Wise was hospitalized. See Memorandum in Support of Defendant Watson's Motion for Summary Judgment ¶ 11, at 2; Memorandum in Support of City of Wichita's Motion for Summary Judgment ¶ 5, at 1-2; Plaintiff's Consolidated Response to Defendants' Motions for Summary Judgment at 10-12.

Also, the district court did not make a finding whether Wise called Sergeant Wanda Parker-Givens and discussed the incident with her. The Defendants contest this fact, arguing that Wise did not call Sergeant Parker-Givens. Based on the deposition testimony to which the Defendants cite, there is a factual issue whether Wise telephoned another officer, Al Ward, who in turn contacted Parker-Givens to investigate the alleged incident. Again, however, this fact is not material to the disposition of the case.

[4]The Defendants allege that Wise was also suspended with pay pending investigation into the incident. The district court did not make a finding on whether either Mitchell or Wise were suspended with pay. Again, this finding is not material to the case's disposition.

The WPD classified the incident as a domestic violence incident. Blake Mumma, a WPD detective, handled the criminal investigation. Hernandez alleges that, during a meeting with Mumma at which she and her father were present, Mumma expressed to them that the investigation was sensitive because it was "divided along racial lines." Deposition of Deborah Hernandez Mitchell at 38:23-24 (taken June 27, 2001).[5] Mitchell also contends that, when he asked Carney if he would be treated in the same way were he African American, Carney responded: "You know the answer to that question, no." Deposition of Patrick Mitchell at 102:20-21 (taken January 3, 2001)(hereinafter "Mitchell Depo."). Carney also testified that, at some point, someone in the WPD had probably expressed the sentiment that, in incidents involving minority employees, the WPD must take more care.

Although Mitchell did not face any criminal charges arising out of the Wise incident, the City of Wichita, however, charged Wise with criminal trespass and battery.[6] Wise was convicted in municipal court on the trespass charge.[7] Wise,

[5]Mumma denies making this statement or any other statement which would lead Hernandez or her father to believe that race was an issue in the investigation, and rebuked the suggestion that it is difficult to investigate incidents involving minority employees. Because Mitchell, however, is the non-moving party, this Court will construe all factual disputes in his favor and assume that Mumma made such a statement to Hernandez and her father.

[6]Although the record is unclear whether the other charge, in addition to trespass, was assault or battery, the district court made the finding that Wise was
(continued...)

however, appealed that conviction to the state district court where she was found not guilty.

Because the Wise incident involved two WPD employees, an internal affairs investigation also occurred. On October 31, 1997, Ron West, WPD Captain of Internal Affairs, issued the Internal Affairs final report on the Wise incident. The report concluded that the charges brought against Mitchell could not be sustained -- meaning that the allegations could not be proved or disproved. According to Mitchell, Watson informed him that he "was exonerated and cleared" of the charges against him. Mitchell Depo. at 160:16.

Although the report cleared Mitchell of all charges, it sustained the three allegations against Wise: (i) criminal conduct prohibited; (ii) conduct unbecoming; and (iii) internal investigations -- false information. Watson decided not to terminate Wise, who was, at the time of the incident, off work

_____

[6](...continued)
charged with trespass and battery. Mitchell's brief, however, contends that Wise was charged with trespass and assault, and, in support of this contention, cites to Mitchell's deposition. Mitchell's deposition, however, is not clear on whether the second charge was for assault or for battery. The Defendants, in asserting that Wise was charged with trespass and battery, cite to Mumma's deposition and some of the briefing at the district court level. It is not clear from these portions of the record whether the second charge was assault or battery. This Court need not disturb the district court's finding, however, because whether Wise was charged with battery or assault is not material to the disposition of the issues before this Court.

[7]As the district court noted, it is not clear from the record whether Wise was acquitted of the battery charge or whether the charge was dropped.

without pay.[8] Instead, Watson testified that he decided that it was in the WPD's best interest to reinstate her position without any further discipline. According to Mitchell, this decision was the equivalent of imposing no discipline at all. West testified that not subjecting Wise to discipline was not "in the normal course of procedural correctness." Deposition of Ronald A. West at 273:3-4 (taken August 7, 2001).

During Mitchell's relationship with Wise, he was also involved in a relationship with Stephanie Lackey. While involved with Mitchell, Stephanie Lackey was married to Kevin Lackey, a WPD officer. Mitchell and Stephanie Lackey's relationship ceased in late June 1997 -- around the same time that Mitchell's relationship with Wise ended.

Lackey was a sergeant with the Kansas Air National Guard and was never employed with the WPD. On July 16, 1997, Lackey filed a complaint against Mitchell with McConnell Air Force Military Police in an attempt to prevent him from entering the base. In the complaint, Lackey alleged that Mitchell followed her in a city vehicle while he was on duty, discouraged her from reconciling with her husband, from whom she had separated, and made a harassing telephone call

---

[8]Watson testified that, to the best of his knowledge, at the time he made the decision to reinstate Wise's position, her absence from work was not the result of a suspension. It is not clear from the record if Wise was off work without pay because of her pregnancy.

in which he threatened her and her husband. McConnell Air Force Base Military Police supplied Internal Affairs with a copy of the complaint. Lackey did not ask the WPD to investigate her complaint, but when contacted by Internal Affairs, she agreed to cooperate with their investigation.

An Internal Affairs investigation into Mitchell's actions toward Lackey ensued ("Lackey matter"). As part of the investigation, West interviewed Lackey twice, during which Lackey described in more detail Mitchell's alleged harassing telephone call. Lackey contends that Mitchell made threatening remarks toward her and her husband, including "if [Mitchell] couldn't have [her], no one could and [that] Kevin had better watch his back." Internal Affairs Report at 2 (dated October 24, 1997). Mitchell denies making this particular statement.

Based on the discrepancies in their versions of events, West asked both Lackey and Mitchell to submit to polygraph examinations. Lackey refused, but, in September 1997, Mitchell took and failed the polygraph. Sometime in September 1997,[9] Watson, Williams, and Carney held a meeting to discuss the tension among supervisors within Mitchell's assigned shift. At that meeting, they decided to place Mitchell on administrative leave. When asked why Mitchell, as opposed to the other shift supervisors, was placed on administrative leave,

---

[9]It is not clear from the record whether this meeting occurred before or after Mitchell failed the polygraph examination.

Williams responded: "There was no particular reason."  Deposition of Norman Williams at 99:21 (taken August 3, 2001).[10]

On October 24, 1997, West issued the Internal Affairs final report on the Lackey matter.  The report sustained all five alleged violations of WPD regulations against Mitchell:  (i) conduct unbecoming an officer: "Each member of the Department . . . shall conduct himself . . . at all times, both on and off duty, in a manner to reflect most favorably on the Department;" (ii) criminal conduct prohibited: "Members of the Department shall not commit or be involved in a crime;" (iii) misconduct prohibited: "Any course of conduct that indicates a member of the Department has little or no regard for his[] obligations as a member of the [WPD] shall be deemed misconduct, and will be cause for dismissal;" (iv) internal investigations -- giving false information: "Any member of the Department found to have knowingly given false information to investigators during an administrative internal investigation will be terminated;" and (v) internal investigations -- failing a polygraph examination: "Any member of the Department who has been ordered by the Chief of Police to submit to a polygraph examination and fails the examination may be subject to immediate dismissal."  Affidavit of W. Michael Watson ¶ 5, at 2 (executed June 24, 2003).

---

[10]These facts, including the last sentence, are not material to our decision. Mitchell does not argue that the alleged adverse action was placing him on administrative leave; instead, he focuses on the termination.

The WPD ranks its regulations violations on a scale of A to F, from least to most severe. The WPD's regulation manual recommends dismissal for an F violation. The manual states, however, that the disciplinary penalties contained within the manual "shall in no way limit any penalty which the Chief of Police may impose." Wichita Police Department Regulation Manual, Regulation 2.0 -- Disciplinary Code/Penalty, at 1 (dated October 14, 1996). Two of the violations sustained against Mitchell were F-grade violations (misconduct prohibited -- no regard for obligations; internal investigations -- giving false information). Williams and Carney recommended to Watson that Mitchell be terminated.

On January 16, 1998, Watson conducted a "pretermination" hearing with Williams, Carney, and Mitchell.[11] At a pretermination hearing, Watson presents the allegations against the employee, with the investigators present, and provides the employee a chance to defend himself. Watson does not, however, supply the employee with a copy of the Internal Affairs report, because he prefers that the employee focus on the allegations against him, rather than "argu[ing] about this word or that word in a particular investigation." Deposition of W. Michael

_____

[11]The district court found that West also participated in the pretermination hearing, however, based on the record before this Court, and the citations provided by the parties, there is no evidence that West was present. This Court need not disturb the district court's finding, however, because whether West was present at the pretermination hearing is not material to the disposition of the issues before this Court.

Watson at 142:18-20 (taken June 1, 2001). Watson informed Mitchell of the meeting's purpose, but when Watson did not allow Mitchell to review a copy of the Internal Affairs report, Mitchell refused to discuss the allegations against him. Watson explained that, by not responding to the allegations, Watson only had West's report on which to rely and would have to recommend termination to the City Manager, Chris Cherches.

After the pretermination hearing, Watson decided to recommend to Cherches that Mitchell be fired. Cherches approved the recommendation, and, on January 26, 1998, Mitchell received a letter noticing his termination.

After Mitchell received the termination letter, he submitted a grievance form requesting reinstatement, back pay, and benefits. Several months after filing the grievance form, the grievance board held a hearing, at which Mitchell's counsel had an opportunity to address the board and to submit supporting documents. On July 17, 1998, the grievance board issued a letter to Cherches recommending that he rescind Mitchell's termination. In its letter, the board criticized several aspects of the investigation -- including that West's Lackey matter report was "highly opinionated," that the record did not substantiate the polygraph examiner's observation that Mitchell was not cooperative, and that -- because Watson made the decision without providing Mitchell an opportunity to review West's report and respond -- Watson made his recommendation of

termination on incomplete facts. Letter from Janice Arbuckle, Sharai McConico, and Dennis Coffey to Chris Cherches at 1 (dated July 17, 1998). Despite these criticisms, however, the board found sufficient evidence of Mitchell's misconduct to recommend that Cherches demote him from lieutenant to officer without supervisory responsibility. See id. The board also recommended that Mitchell receive "a reasonable number of days of disciplinary supervision without pay retroactive to his original termination date." See id.

Cherches reviewed and accepted the board's recommendations, and sent Mitchell a letter indicating that he was reinstated without backpay to the rank of officer. Mitchell opted to not return to the WPD, believing that his credibility had been irreparably tarnished.

## STANDARD OF REVIEW

When analyzing summary judgment on appeal:

This court reviews the district court's grant of summary judgment de novo, using the same standards applied by the district court. Byers v. City of Albuquerque, 150 F.3d 1271, 1274 (10th Cir. 1998). The evidence and reasonable inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party. Id. Summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Stover v. Martinez, 382 F.3d 1064, 1070 (10th Cir. 2004).

## ANALYSIS

There is no direct evidence of discrimination. Mitchell must therefore try to avoid summary judgment by pointing to factual issues within the burden-shifting framework that the Supreme Court of the United States created in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Mitchell has not shown a sufficient factual issue to avoid summary judgment.

## I. THE DISTRICT COURT DID NOT ERR IN GRANTING THE DEFENDANTS SUMMARY JUDGMENT ON THE RACE DISCRIMINATION CLAIM.

Mitchell alleges that the district court erroneously granted summary judgment in favor of the Defendants on his reverse discrimination claim. Because this Court concludes that there is no direct evidence of discrimination, that Mitchell does not present sufficient circumstantial evidence to establish a prima facie case of discrimination, and that, even assuming that the prima facie case is met, Mitchell does not offer evidence demonstrating that the Defendants' legitimate, nondiscriminatory reason is pretextual, the Court will affirm the district court's ruling.

### A. REVERSE DISCRIMINATION AND THE MODIFIED MCDONNELL DOUGLAS ANALYSIS.

A plaintiff may establish intentional discrimination either by direct evidence or by indirect proof under the analytical framework that the Supreme Court set forth in McDonnell Douglas Corp. v. Green. See 411 U.S. at 802-04;

-13-

Kendrick v. Penske Transp. Services, Inc., 220 F.3d 1220, 1225 (10th Cir. 2000).

When the plaintiff is proceeding under McDonnell Douglas Corp. v. Green, the

plaintiff must first set forth a prima facie case of discrimination. See Tex. Dep't

of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).

In a discriminatory discharge case, a plaintiff must normally establish four

elements for the prima facie case under McDonnell Douglas Corp. v. Green: (i) he

is a member of a protected class; (ii) he was qualified for his job; (iii) despite his

qualifications, he was discharged; and (iv) the job was not eliminated after his

discharge. See Kendrick v. Penske Transp. Services, Inc., 220 F.3d at 1227, 1229. In

a reverse discrimination case, however, this Court has modified the first element

of the prima facie case and, instead of demonstrating that the plaintiff is a

member of a protected class, he must instead "establish background circumstances

that support an inference that the [employer] is one of those unusual employers

who discriminates against the majority." Notari v. Denver Water Dep't, 971 F.2d

585, 589 (10th Cir. 1992). See Mattioda v. White, 323 F.3d 1288, 1292 (10th Cir.

2003). The plaintiff may also satisfy its burden of establishing a prima facie case

of reverse discrimination with "indirect evidence sufficient to support a

reasonable probability[] that but for the plaintiff's status[,] the challenged

employment decision would have favored the plaintiff." Notari v. Denver Water

Dep't, 971 F.2d at 590. See Stover v. Martinez, 382 F.3d at 1075-76. Notari v.

Denver Water Dep't "does not displace the McDonnell Douglas paradigm but simply provides an alternative basis upon which plaintiffs may satisfy their prima facie burden." 971 F.2d at 591.

If the plaintiff establishes a prima facie case for either claim, the burden shifts to the defendant to come forward with a legitimate nondiscriminatory reason for its employment related decision. See McDonnell Douglas Corp. v. Green, 411 U.S. at 802. Upon the employer's articulation of a legitimate, nondiscriminatory reason, the presumption of discrimination established by the prima facie case "simply drops out of the picture." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993). To withstand summary judgment, a plaintiff must "present[] evidence that the defendant's proferred reason for the employment decision was pretextual-i.e. unworthy of belief." Kendrick v. Penske Transp. Services, Inc., 220 F.3d at 1230. "Pretext can be shown by 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proferred legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)(quoting Olson v. Gen. Elec. Astrospace, 101 F.3d 947, 951-52 (3d Cir. 1996)). "To avoid summary judgment, a party must produce specific facts showing that there remains a genuine issue for

-15-

trial and evidence significantly probative as to any [material] fact claimed to be disputed. Thus, plaintiffs' mere conjecture that their employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988)(internal citations and quotations omitted)(alteration in the original).

## B.    THERE IS NO DIRECT EVIDENCE OF DISCRIMINATION.

Mitchell first contends that the district court erred in its determination that Mitchell did not present direct evidence of discrimination. Mitchell offers two statements in support of this claim: (i) Mumma's statement about the Wise incident investigation being divided along racial lines; and (ii) Carney's statement that Mitchell would have been treated differently if he were African American.[12]

---

[12]Mitchell alleges that the evidence of this statement is "uncontroverted." Appellant's Brief at 26. Mitchell also contends that the Defendants admitted the statements occurred, but, in support of this proposition, cites to the district court's opinion. The district court disposed of the Defendants' hearsay objection to Carney's statement, but did not address whether the Defendants admitted that either statement occurred. In the Defendants' joint reply brief before the district court, the Defendants disputed both statements. On Mumma's alleged statement, the Defendants cite to Mumma's deposition in which he denies making a statement expressing the difficulties of the investigation being divided along racial lines or any similar statement. The Defendants also cited to Carney's deposition, in which he refutes the proposition that the WPD disparately disciplines minority employees. The Defendants also refer to Carney's deposition in which he did not recall having a conversation about the WPD not being "the melting pot it claims to be." Carney Depo. at 192:4-9. Thus, unlike Mumma's

(continued...)

-16-

"Direct evidence is '[e]vidence, which if believed, proves [the] existence of [a] fact in issue without inference or presumption.'" Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1207 (10th Cir. 1999)(quoting Black's Law Dictionary 460 (6th ed. 1990)), overruled in part on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003). "Statements showing 'an existing policy which itself constitutes discrimination' are direct evidence of discrimination." Heim v. State of Utah, 8 F.3d 1541, 1546 (10th Cir. 1993)(quoting Ramsey v. City & County of Denver, 907 F.2d 1004, 1008 (10th Cir. 1990)). Thus, statements expressing a personal opinion, "even when reflecting a personal bias or prejudice, do not constitute direct evidence of discrimination." Shorter v. ICG Holdings, Inc., 188 F.3d at 1207. Instead, by offering such statements, the plaintiff asks the fact-finder to infer that, because the defendant harbors personal opinions, the defendant acted with discriminatory intent toward the plaintiff. See Heim v. State of Utah, 8 F.3d at 1546-47. Thus, the court may consider statements reflecting

_____

[12](...continued)
deposition, the Defendants do not offer evidence in which Carney denies having the conversation at issue with Mitchell. Mumma's deposition, however, contradicts Mitchell's contention that Mumma made the alleged statement. Thus, contrary to Mitchell's contention, there is evidence in the record to support the Defendants' contention that Mumma did not make the statement at issue. Moreover, the Defendants raised this argument at the district court level, thus it is properly before this Court. Because this Court must construe all facts in favor of the non-moving party, however, this Court will assume for the purposes of summary judgment that Mumma and Carney made the statements at issue.

personal opinions only when determining if there is "circumstantial or indirect evidence of discrimination against the plaintiff." Stone v. Autoliv ASP, Inc., 210 F.3d 1132, 1136 (10th Cir. 2000).

"Proof by direct evidence requires evidence that the actual motive behind the termination of [the plaintiff's] employment was discriminatory animus. Evidence demonstrating discriminatory animus in the decisional process needs to be distinguished from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." Clearwater v. Indep. Sch. Dist. No. 166, 231 F.3d 1122, 1126 (8th Cir. 2000)(quotation and citations omitted). See Cuenca v. Univ. of Kan., No. 03-3145, 2004 WL 1328676, at **4 (10th Cir. June 15, 2004)("In general, statements by a non-decisionmaker . . . cannot be used to establish that a decision was tainted by discriminatory animus."); McCrary v. Aurora Public Sch., No. 02-1098, 2003 WL 191433, at **3 (10th Cir. Jan 29, 2003)(quoting Clearwater v. Indep. Sch. Dist. No. 166, 231 F.3d at 1126); Jones v. Unisys Corp., 54 F.3d 624, 632 (10th Cir. 1995)(concluding that a "stray remark by someone not in a decision-making position does not establish intent to discriminate"); Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 531 (10th Cir. 1994)(in an Age Discrimination in Employment Act decision, holding that "age-related comments by

-18-

non-decisionmakers are not material in showing the [employer's] action was based on age discrimination").

This Court agrees with the district court's conclusion that neither Mumma's nor Carney's statements constitute direct evidence. There is no evidence in the record that Mumma was involved in Mitchell's termination proceedings. Moreover, Mumma's statement that the investigation was sensitive because it was "divided along racial lines" does not suggest that the actual motive behind the decision to terminate Mitchell was discriminatory. Nor does it support Mitchell's contention that the statement demonstrates "an existing policy which itself constituted discrimination." Heim v. State of Utah, 8 F.3d at 1546.

With Carney's statement, the record indicates that Carney, after reviewing the Lackey matter report, recommended to Watson that Mitchell be terminated. The evidence also suggests that Watson, and not Carney, had the final word whether to recommend Mitchell's termination to Cherches. There is no evidence in the record that Carney could terminate Mitchell without Watson's recommendation and Cherches' approval. Even assuming, however, that Carney is a decisionmaker, his statement -- that Mitchell would have been treated differently if he were African American -- is not evidence of direct

discrimination.[13]  Instead, it is a statement which at most reflects Carney's personal opinion and is not direct evidence that Carney, Watson, or Cherches acted with unlawful animosity.  This observation is also true of Carney's testimony that someone in the WPD had probably expressed the sentiment that, in incidents involving minority employees, the WPD must take more care.  This statement is not only an expression of a personal opinion, but is based on speculation and conjecture.  It does not, therefore, support a finding that there was direct evidence of discrimination.  Accordingly, the district court did not err in concluding that there was no direct evidence of discrimination.

### C. MITCHELL DOES NOT OFFER SUFFICIENT EVIDENCE TO ESTABLISH A PRIMA FACIE CASE OF REVERSE RACIAL DISCRIMINATION.

Mitchell also alleges that the district court concluded erroneously that Mitchell failed to establish a prima facie case under the McDonnell

---

[13]This case is inapposite to this Court's decision in McGarry v. Board of County Commissioners, 175 F.3d 1193 (10th Cir. 1999), a failure to hire case in which this Court held that statements, including that the hires at issue were "minority hirings," id. at 1196, constituted direct evidence of discrimination, see id. at 1200.  The employee who made the statements was in charge of investigating the hiring process -- although she did not have the authority to hire the plaintiff.  See id.  In this case, however, the WPD did not invest either Mumma or Carney with the same authority as the employee in McGarry v. Board of County Commissioners, who "had the duty of overseeing the general management policies of the personnel department."  Id.  More importantly, unlike the statements in McGarry v. Board of County Commissioners, Carney's and Mumma's statements are at most personal observations and opinions and, thus, do not constitute direct evidence of reverse discrimination.

Douglas/Notari framework. In its Memorandum Opinion and Order, the district court found that Mitchell did not offer evidence establishing that the City of Wichita was one of the unusual employers who discriminated against the majority. The district court also held that Mitchell did not "establish a reasonable probability that, but for his race, he would not have been terminated." Memorandum Opinion and Order at 17. Because Mitchell does not establish a prima facie case of racial discrimination, this Court affirms the district court's decision to grant summary judgment in the Defendants' favor on the reverse discrimination claim.

### 1. Mitchell does not offer sufficient evidence to establish a prima facie case of reverse racial discrimination.

Mitchell attempts to satisfy his burden of establishing a prima facie case of racial discrimination with "indirect evidence sufficient to support a reasonable probability[] that but for the plaintiff's status[,] the challenged employment decision would have favored the plaintiff." Notari v. Denver Water Dep't, 971 F.2d at 590. In explaining the alternative basis upon which a non-minority plaintiff may establish a prima facie case of discrimination, this Court explained that "the plaintiff must allege and produce evidence to support specific facts that are sufficient to support a reasonable inference that but for the plaintiff's status the challenged decision would not have occurred." Id. Mitchell alleges that he "presented uncontroverted evidence that two minority employees of the Police

-21-

Department received better treatment than he did when faced with similar disciplinary complaints." Appellant's Brief at 31. Mitchell compares himself to two employees -- Officer K and Wise. Mitchell provides a laundry list of investigations into alleged misconduct by Officer K, a male African American WPD officer with no supervisory responsibilities.[14] According to Mitchell, that Officer K faced similar charges without being terminated by either the WPD or the City of Wichita is circumstantial evidence supporting Mitchell's contention that but for his race, he would not have been terminated. Similarly, Mitchell highlights that even though Wise, an African American, faced charges similar to those Mitchell faced in the Lackey matter, she was not terminated. The comparison to these employees, however, is not sufficient to support a reasonable probability that he would not have been terminated but for his racial status.

Of particular import in this analysis is that, unlike Mitchell, Officer K and Wise did not have supervisory responsibilities. See Watts v. City of Norman, 270 F.3d 1288, 1293 (10th Cir. 2001)(holding, in the pretext analysis, that "employees may not be 'similarly situated' when one is a supervisor and the other is not").[15]

---

[14]In two brief sentences in his fact section, Mitchell mentions "Officer F." He does not, however, address Officer F in his discussion of the issues and, thus, this Court will not consider him in determining whether Mitchell offered evidence of a similarly situated employee.

[15]Mitchell contends that the disciplinary matrix applies uniformly to all employees and, thus, he need not compare himself to other supervisors. As the

(continued...)

Despite Mitchell's argument to the contrary, it is necessary to determine whether Mitchell was similarly situated to the minority employees to whom he compares himself. Unless the other employees are subject to the same responsibilities, expectations, and discipline, the comparison to the disciplinary action taken against them does not support the inference that race is the reason for the disparity in treatment.

This Court agrees with the district court's conclusion that the two employees to whom Mitchell compares himself, a records clerk with no supervisory responsibilities and a lower-ranking officer without Mitchell's supervisory authority, are not similarly situated to Mitchell. Without being similarly situated, this evidence does not "support specific facts that are sufficient to support a reasonable inference that but for the plaintiff's status the challenged decision would not have occurred." Notari v. Denver Water Dep't, 971 F.2d at 590.

---

[15](...continued)
district court recognized, this argument is without merit. According to the regulations, although the matrix is binding on supervisors, the Chief of Police, when making his decision about the appropriate discipline for any given violation, is not bound by the disciplinary matrix set forth in the regulations. This Court agrees with the district court that, because the disciplinary matrix is not a "strict recipe for meting out punishment . . . [Mitchell] must show that it was unequally applied to similarly situated employees." Memorandum Opinion and Order at 13.

In addition, although Mumma's and Carney's statements reflect concern about racial tension in the WPD and speculation that, had Mitchell been African American, he would have been treated differently, they do not provide the requisite "specific facts" from which this Court can conclude that, but for Mitchell's race, he would not have been terminated. Notari v. Denver Water Dep't, 971 F.2d at 590. Thus, there is insufficient circumstantial evidence to establish a reasonable probability that Mitchell would not have been terminated but for his status as a Caucasian.[16]

It is unclear whether, in addition to proceeding under Notari's holding regarding indirect evidence satisfying the prima facie case for reverse

[16]Mitchell alleges that the district court committed reversible error by not considering Mumma's and Carney's statements when it evaluated whether Mitchell offered sufficient evidence to establish a prima facie case of discrimination based on indirect evidence. This Court, however, reviewed Mitchell's response to the Defendants' motions for summary judgment, which contains 133 additional facts. In that response, Mitchell does not address Mumma's and Carney's statements when arguing that he has circumstantial evidence of discrimination or attempt to explain how or why these statements support his contention that the Defendants illegally discriminated against him. It is the party's, and not the district court's, function to present the material facts to the court and then, in its analysis, apply those facts to the law. It is not the court's role to hunt through the briefing and determine whether facts lurking in the background support a particular legal contention for which the party did not offer them. Accordingly, the district court did not err in not considering these facts in its analysis. Nevertheless, this Court has considered Mumma's and Carney's statements and concludes that, considering the other evidence before this Court, Mitchell does not satisfy his burden under the Notari burden-shifting analysis.

-24-

discrimination, Mitchell also follows Notari's holding under which he must present evidence of "background circumstances that support an inference that the [employer] is one of those unusual employers who discriminates against the majority." 971 F.2d at 589. Regardless of under which theory Mitchell's case proceeds, however, summary judgment is appropriate. Even construing Mitchell's brief liberally to include the allegation that he offered evidence of background circumstances indicating that the City of Wichita or the WPD discriminates against the majority, Mitchell has not offered evidence establishing the necessary background circumstances giving rise to an inference of discrimination. Mitchell did not put forth any evidence of other Caucasian employees against whom the City of Wichita or the WPD has discriminated. Moreover, Mumma's statement, in which he expressed caution because the Wise investigation was divided among racial lines, and Carney's statement, that Mitchell would have been treated differently if he were African American, are "insufficient evidence from which a jury could find that [the City of Wichita or the WPD] engaged in a pattern of terminating white employees because of an anti-white bias." Lyons v. Red Roof Inns Inc., No 04-1360, 2005 U.S. App. LEXIS 9273, at *15 (10th Cir. May 12, 2005). Thus, this Court concludes that he has not offered sufficient evidence to establish a prima facie case of racial discrimination on this basis.

**2. Mitchell does not present evidence that the Defendants' legitimate, nondiscriminatory reason is pretextual.**

Although the district court ended its analysis by concluding that Mitchell did not establish a prima facie case of intentional reverse discrimination, this Court holds that, even assuming Mitchell made a prima facie case, summary judgment was nevertheless appropriate. Once Mitchell establishes a prima facie case, the burden shifts to the Defendants to come forward with a legitimate nondiscriminatory reason for their employment related decision. See Notari v. Denver Water Dep't, 971 F.2d at 588; McDonnell Douglas Corp. v. Green, 411 U.S. at 802. According to the Defendants, the reason the WPD recommended, and the City of Wichita approved Mitchell's termination is that they received a complaint from McConnell Air Force Base, which, because of the seriousness of the allegations involved, the WPD investigated. As a result of the investigation, West concluded that Mitchell violated five WPD regulations, including two of the most serious offenses: misconduct prohibited (no regard for obligations) and internal investigations (giving false information). Watson reviewed the report and decided to recommend termination because of the five sustained violations. Cherches reviewed the report and spoke with Watson about his recommendation, and agreed to approve the recommendation. Thus, the Defendants offered a legitimate nondiscriminatory reason for Mitchell's termination.

-26-

Having articulated a legitimate, nondiscriminatory reason for Mitchell's termination, Mitchell must now "'present[] evidence that the defendant's proferred reason for the employment decision was pretextual-i.e. unworthy of belief.'" Kendrick v. Penske Transp. Services, Inc., 220 F.3d at 1230 (quoting Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995)). The only evidence that Mitchell offers to support his contention that the Defendants' proffered reason to terminate him is pretextual is that the Defendants treated him disparately compared to two minority employees, Officer K and Wise. See Watts v. City of Norman, 270 F.3d at 1293 ("One of the established methods of proving pretext is to show that the employer treated the plaintiff differently from other similarly-situated employees who violated work rules of comparable seriousness." (quoting omitted)). As discussed earlier, however, neither Officer K nor Wise are similarly situated to Mitchell because, unlike Mitchell, neither had supervisory responsibilities, and, thus, comparing Mitchell's situation to theirs is not probative on the issue of pretext.[17] Because Mitchell has not presented evidence demonstrating that the Defendants' proffered legitimate, nondiscriminatory reason

---

[17]Mitchell discusses at length that Watson recommended Mitchell's termination, in part, because he failed the polygraph and that Watson did not recommend Officer K's termination, even though he too failed the polygraph. Appellant's Brief at 23-24, 32-33, 35. Again, however, there is no reason to discuss this at length because the lack of similarly situated employees disposes of this argument.

is pretextual, the Defendants are entitled to summary judgment on the reverse discrimination claim.

## II. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT ON THE EQUAL PROTECTION CLAIM.

On appeal, Mitchell also contends that the district court erred when it granted summary judgment in favor of the Defendants on his equal protection claim. This Court agrees with the court below and, accordingly, affirms its decision.

"The equal protection clause is triggered when the government treats someone differently than another who is similarly situated." Buckley Constr., Inc. v. Shawnee Civic & Cultural Dev. Auth., 933 F.2d 853, 859 (10th Cir. 1991)(citing City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)). "[T]he Equal Protection Clause protects not only against discrimination where victims within an identified classification or group are injured, but also where the plaintiff alleges 'an element of intentional or purposeful discrimination' so as to invoke the clause to protect an individual victim." Smith v. E. N.M. Med. Ctr., No. 94-2213 & 94-2241, 1995 WL 749712, at **7 (10th Cir. Dec. 19, 1995)(quoting Buckley Constr., Inc. v. Shawnee Civic & Cultural Dev. Auth., 933 F.2d at 859).

Just as this Court concluded that Wise and Officer K were not similarly situated to Mitchell for the purposes of the Title VII analysis, the same conclusion

applies to the equal protection analysis. At the time the WPD terminated Mitchell, he was a lieutenant, a position that carried with it supervisory responsibilities. Mitchell attempts to compare himself to Wise, a records clerk with no supervisory responsibilities, and Officer K, a lower-ranking officer whose position did not entail any supervisory responsibilities. Because Mitchell offers no similarly situated employees to whom he can compare himself to establish discriminatory preferential treatment, this Court agrees with the district court that the Defendants are entitled to summary judgment on the equal protection claim.[18]

The district court's decision is therefore **AFFIRMED**.

Entered for the Court

James O. Browning
District Judge

---

[18]Again, this Court need not address at length whether the polygraph was indicative of discrimination because Mitchell and Officer K are not similarly situated.