FILED
United States Court of Appeals
Tenth Circuit

March 1, 2023

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

EMINA GEROVIC,

     Plaintiff - Appellant,

v.

CITY AND COUNTY OF DENVER;
LEROY LEMOS; JAMES E.
WILLIAMSON; JOEL WOMICK; KYLE
KNOEDLER; HSS, INC.,

     Defendants - Appellees.

No. 22-1148
(D.C. No. 1:19-CV-03710-RM-NRN)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BACHARACH**, **BRISCOE**, and **MURPHY**, Circuit Judges.
_____

Plaintiff-Appellant Emina Gerovic appeals the district court's entry of summary

judgment in favor of the defendants: (1) her former employer, the City and County of

Denver (the "City"); (2) two of the City's employees, Leroy Lemos and James

Williamson[1] (collectively with the City, the "City Defendants"); (3) HSS, Inc. ("HSS"), a

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] Gerovic included two additional City employees in her operative complaint: Murphy Robinson and Kevin O'Neil. In her response to the City Defendants' summary judgment motion, however, Gerovic stated that she did not object to the

(Cont'd)

private contractor that the City hired to provide security personnel services at its buildings; and (4) two HSS employees, Joel Womick and Kyle Knoedler (collectively with HSS, the "HSS Defendants").[2]

At issue in this appeal are (1) Gerovic's claims against the City Defendants for race and color discrimination, national origin discrimination, and retaliatory discharge, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981 and 42 U.S.C. § 1983; and (2) Gerovic's § 1983 claims against the HSS Defendants for violation of her equal protection rights under the Fourteenth Amendment.  Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND

### A. Factual Background[3]

#### 1.  *Gerovic's Employment with the City*

Gerovic is a Caucasian female of Bosnian ethnicity.  In August 2014, she began her employment with the City as a custodian in the Facilities Management Department.  She initially worked at Denver Police District ("DPD") Five, although she was later reassigned to work at Denver Human Services ("DHS").

---

dismissal of her claims against these two defendants.  Accordingly, Gerovic is not appealing the portion of the district court's order granting summary judgment to Robinson and O'Neil.

[2] The HSS Defendants have submitted a separate appellee brief from the City Defendants.  In the interest of clarity, we refer to the City Defendants' brief as "Aple. Br." and the HSS Defendants' brief as "HSS Br."

[3] The following facts are undisputed, unless otherwise noted.

2

Defendant Leroy Lemos is a Hispanic male, and he served as the Operations Supervisor in the City's General Services Agency during Gerovic's employment with the City. Lemos's supervisor, Defendant Kevin O'Neil, is a Caucasian male who served as the Deputy Director of Facilities Management. O'Neil's supervisor, Defendant James Williamson, is an African-American male who served as the Director of Facilities Management. Williamson's supervisor, Defendant Murphy Robinson, is an African-American male who served as the Executive Director of General Services.

Defendant HSS, a private contractor, was hired by the City to provide security personnel services at government buildings. Defendants Joel Womick and Kyle Knoedler were employees at HSS. When Gerovic was employed by the City, Womick was the Assistant Director of Operations for HSS, and Knoedler was a Facility Security Supervisor for HSS.

### 2. *Gerovic's Early Discipline History*

Shortly after Gerovic began her employment with the City of Denver, she developed a discipline history due to a handful of incidents at work.

In 2015, Gerovic received a verbal warning for wearing a gray DPD sweatshirt while on duty at the City's Police Administration Building ("PAB"). Gerovic received a verbal warning for this incident because the DPD sweatshirt was not part of her facilities management uniform, and it could cause problems if she were misidentified as a police officer.

3

On September 21, 2015, Gerovic received a verbal reprimand from Custodial Supervisor James Stigall, a Caucasian male, for not wearing her safety shoes.

On October 1, 2015, Gerovic received a verbal warning from Custodial Supervisor Tony Rios, a Hispanic male, for receiving a poor to fair inspection report rating.

On June 13, 2016, Lemos gave Gerovic a documented counseling conversation regarding her personal use of her City-issued cell phone.

On March 17, 2017, Gerovic received a documented counseling conversation from Rios regarding her failure to answer her phone when Lemos called, as well as her failure to set up her voice mail.

These incidents did not result in a pay change, change in job duties, or any other change in Gerovic's employment status. Although Gerovic's termination letter lists her prior discipline, it does not state that any prior discipline was the basis for her termination.

### 3. *Gerovic's Incident at the Denver Motor Vehicles Office*

On May 4, 2017, Lemos issued Gerovic a revised Written Reprimand Disciplinary Action, regarding an incident that occurred at the Denver Motor Vehicles ("DMV") office, in the Arie P. Taylor Building. Gerovic disputes the City Defendants' recitation of the facts as to this incident.

The written reprimand stated that, on March 16, 2017, Lemos received a phone call from an "irate" DMV office customer, Brian J., an African-American male.

Aple. App., Vol. I at 149. Brian allegedly called with Daniel G.,[4] a witness to incident, standing next to him, so that Daniel could hear the complaint to verify and correct anything that Brian said.

According to the written reprimand, Brian told Lemos that he entered the Arie P. Taylor Building "via the unlocked East entrance," and "proceeded down the stairs to the 1st floor lobby to await the DMV office to open, where he encountered Daniel G. also waiting." *Id.* at 149. The written reprimand notes that "Daniel said that he got lucky and the nice city worker [Gerovic] let him in" the building. *Id.*

The written reprimand states that Gerovic then came into the lobby and told Brian, the African-American male, that the building was not yet open and he needed to wait outside—even though she did not say the same thing to Daniel. As a result, Gerovic and Brian allegedly got into a heated, verbal exchange that was overheard by several witnesses.

Sequoya Palin, a HSS security agent, submitted a written statement referred to in the written reprimand where she asserts that Gerovic told her she let Daniel into the building. Additionally, the written reprimand states that the City's Human Resources representative, Anne Carter, interviewed a ResCare employee, Jerrick

---

[4] Daniel's race is not explicitly stated in the record. In the written reprimand, however, the City states that Brian accused Gerovic of treating the two men differently because of race. While speaking about the incident, Brian reportedly told HSS Agent Stanford that it "is racism to kick [him] out and let the white man stay." Aplt. App., Vol. III at 19.

Perkins, about the incident.  According to Perkins, Gerovic told him she was worried she was going to get into trouble for letting Daniel into the building.

Carter and Lemos met with Gerovic about the incident on March 17, 2017.  Gerovic represented that she did not let Daniel into the building.  However, the security camera footage indicated that Daniel did not enter the building through the unlocked door that Brian used, which is consistent with Daniel's representations that Gerovic let him in through the locked door.

Gerovic contends that "she was not dishonest with her employer and explicitly disputed that she had let anyone, of any race, into the building," and she testified accordingly in her deposition.  Reply Br. at 2.

Although Lemos's investigation into this incident at the DMV was the basis for Gerovic's written reprimand, it was not the basis for her termination, and it is not identified as such in her termination letter.

### 4.  *Gerovic's Facebook Profile*

In September 2017, the City received information that Gerovic was representing herself as a Denver Police Officer on her public Facebook profile.  During Gerovic's administrative appeal of her termination, Anna Forsberg, a City employee, testified under oath that her daycare provider notified her about Gerovic's Facebook profile.  Forsberg then took a screenshot of the page and sent it to Carter, the City's Human Resources representative.  Thereafter, Lemos viewed Gerovic's Facebook profile and confirmed that Gerovic was representing herself as a Denver Police Officer.

6

Gerovic's public Facebook profile listed her occupation as "Police Officer" and her employer as the "Denver Police Department." Aple. App., Vol. I at 180–182. Her profile also included the following photographs: (1) Gerovic wearing a t-shirt with a DPD emblem, posted in 2014; (2) two photographs of Gerovic wearing a DPD patrol person's hat, posted in 2015; (3) Gerovic's DPD-issued access card that features a DPD badge, posted in 2014; and (4) Gerovic wearing a hooded sweatshirt with a DPD emblem, posted in 2015.[5]

Gerovic testified that the photographs of her wearing the police hat were taken at the clerk's office in the PAB, and they were posted to her Facebook page from the clerk's office in the PAB by the police officer who took the picture, per her request. Gerovic also testified that none of the posts state that the photographs were taken outside of working hours.

Sergeant Randy Steinke of the Denver Police Department interviewed Gerovic about her Facebook posts, and he had Gerovic show him where the pictures were taken. Steinke testified under oath at Gerovic's administrative hearing that the pictures of Gerovic in the police hat were taken at the information desk in the police lobby. Additionally, Steinke testified that the picture of Gerovic in the t-shirt with

---

[5] The City Defendants contend that, in the comments section of the photographs where Gerovic was wearing the police hat, one commenter referred to Gerovic as a "policewoman" in Bosnian, with the word "MILICIONERKA." Aple. App., Vol. II at 34; *see* Aple. App., Vol. I at 184. Although Gerovic initially disputed this fact, at oral argument she agreed that one commenter indicated that they thought Gerovic was, in fact, a police officer.

the DPD emblem was taken in a room in the PAB.  Finally, Gerovic testified that she

took the picture of her access badge for the PAB in the custodian closet at the PAB.[6]

### 5.  *The City's Response to Discovering Gerovic's Facebook Profile*

On September 19, 2017, Gerovic was issued a Contemplation of Discipline

letter, scheduling a Contemplation of Discipline meeting to occur on

September 28, 2017.  The next day, on September 20, 2017, Gerovic was issued a

Notice of Change in Work Location letter, stating that she was being assigned to

work at the Castro Building (which houses the DHS, rather than the DPD), and that

her new shift would be from 1:30 p.m. to 10:00 p.m., rather than her previous shift

from 6:00 a.m. to 2:30 p.m.  O'Neil testified under oath during Gerovic's

administrative appeal hearing that he was the one who decided to change Gerovic's

work location.  On September 21, 2017, Gerovic met with O'Neil to discuss her

location and shift change.

Gerovic then went to Robinson's office to meet with him.  During their

meeting, Gerovic admitted that she had made a mistake with her Facebook posts.

Gerovic testified that while she was in Robinson's office, she was crying, and she

said something to the effect of: "even if I kill myself to" prove how good she was

working.  Aple. App., Vol. I at 94.  However, Robinson heard Gerovic say that she

was going to kill herself, which caused him to fear for her safety.  As a result, on

---

[6] Gerovic also testified that the photograph of her wearing the hooded sweatshirt with the "DPD" emblem was taken in her car, on her way home from work.

September 22, 2017, Gerovic was placed on paid administrative leave, and she was scheduled for a fitness for duty exam. Gerovic's Administrative Leave Action Notice stated that she should not report to the workplace, and Carter, the Human Resources representative, instructed her the same.[7]

### 6. *Gerovic's Administrative Leave & HSS's "Be-on-the-Lookout" Posters*

Around the time that Gerovic was placed on administrative leave, the City instructed HSS, the private security contractor, to create a "Be On the Look Out" ("BOLO") poster so that Gerovic's department could be aware of when she was entering City facilities. The BOLO poster was directed to "HSS Employees in ALL Buildings," and it stated: "If [Gerovic] is seen entering ANY Building[,] contact your supervisor immediately." Aple. App., Vol. I at 237 (emphasis omitted). HSS employee Knoedler created the requested BOLO poster on September 22, 2017, and he updated the BOLO poster on October 3, 2017.

Gerovic was placed on administrative leave with pay for nine days from September 22, 2017, through October 3, 2017. On or about October 3, 2017, Gerovic received a Notice of Change in Work Location, which changed her schedule back to 6:00 a.m. to 2:30 p.m., although she was still assigned to work at the DHS, rather than the DPD. When Gerovic returned from administrative leave, she returned to her work as a custodian on the same shift, with the same pay, and no change in benefits.

---

[7] The City Defendants contend that Gerovic entered her workplace, a secure area, on the morning of September 22, 2017, and she was discovered by her supervisor. However, Gerovic disputes this point.

9

When Gerovic returned to work, on or about October 5, 2017, she overheard co-workers talking about the BOLO posters. Gerovic became upset and raised her concerns with City staff. The City then ordered HSS to remove the BOLO posters from all locations. According to the HSS Defendants, the BOLO posters were kept at a security desk that was not accessible to the public or non-HSS employees.

### 7.  *Contemplation of Discipline Meeting & Gerovic's Termination*

The Contemplation of Discipline letter from September 19, 2017, was subsequently revised and re-issued on October 18, 2017, to include additional information regarding (1) the Facebook posts; (2) Gerovic's September 20, 2017, meeting with Lemos; (3) Gerovic's September 21, 2017, meeting with O'Neil; (4) her September 21, 2017, meeting with Robinson; and (5) her September 22, 2017, appearance at work when she was on administrative leave.

A contemplation of discipline meeting was held on October 31, 2017, where Gerovic was represented by an attorney and had the opportunity to discuss everything in the Contemplation of Discipline Letter. After the contemplation of discipline meeting, Williamson notified Gerovic of his decision to terminate her employment on November 27, 2017.

The dismissal letter set forth Gerovic's disciplinary history, which included a written and a verbal reprimand, two instances of documented counseling, and a verbal warning. However, the primary focus of the dismissal letter was Gerovic's public Facebook profile and the misrepresentations contained therein—as well as

Gerovic's evasive and inconsistent answers regarding the investigation into her

Facebook posts.[8]  In the dismissal letter, Williamson stated the following:

> Falsely identifying yourself to the public as a police officer is both
> troubling and unacceptable. . . . By wearing clothing items that have
> police badges, posting pictures of yourself in police issued clothing and
> posting a copy of your police building access card, you can create
> public confusion regarding your role, responsibilities[,] and duties.  It
> can also be dangerous to you and the public, should someone need
> police assistance or intervention and come to you for help.
> Representing yourself [as] a police officer, as a joke or to impress
> others, is not only deceitful, but could be perceived as impersonating a
> police officer, which is a serious offense.

Aple. App., Vol. I at 197–98.

### B.  Procedural Background

On September 21, 2018, Gerovic filed a charge of discrimination with the

EEOC, checking the boxes for "retaliation," "race," and "color."  Aple. App., Vol. I

at 268.  The gist of Gerovic's discrimination charges is that she believed she was

singled out by Lemos for disciplinary action and punishment because she "is not

Latino."  *Id.* at 272.

---

[8] The district court observed that Gerovic "made multiple evasive and nonresponsive statements that the City found difficult to reconcile."  Aple. App., Vol. III at 138.  For example, the dismissal letter notes that, when Lemos asked about Gerovic's self-identification as a police officer on her Facebook page, she replied, "I do not know how that got there," and, when asked about the photographs in DPD uniforms, she replied, "Those were just for fun a long time ago."  Aple. App., Vol. I at 197.  Additionally, when the dismissal letter references the photograph of Gerovic wearing a t-shirt with the DPD emblem, it notes that Gerovic "state[d] the badge on the gray shirt was a sticker, when, in fact, it is clearly an embroidered patch."  *Id.*  The dismissal letter also notes that Gerovic initially stated that the pictures of her wearing a patrol person's hat were the result of her being "told" by Officer Ray to put on the hat; in a subsequent interview, however, Gerovic "implied [she was] following a police order to put on the hat and then a picture was taken."  *Id.*

After obtaining a "right to sue" letter, Gerovic filed this lawsuit in the United States District Court for the District of Colorado on December 30, 2019. In her Second Amended Complaint, Gerovic alleged that the defendants "created and condoned a work environment that was hostile to employees who are not Hispanic." Aplt. App., Vol. I at 24. As pertinent to this appeal, Gerovic asserted the following claims for relief: (1) Title VII race and color discrimination against the City (Count I); (2) Title VII retaliation against the City (Count II); (3) § 1981 claims for violation of her equal protection rights under the Fourteenth Amendment against all of the defendants except the City (Count III); and (4) § 1983 claims for violation of her equal protection rights under the Fourteenth Amendment against all of the defendants except the City (Count IV).[9]

The City Defendants and the HSS Defendants moved for summary judgment. In response, Gerovic raised a new theory of national origin discrimination by the City Defendants in her summary judgment briefing.[10]

_____

[9] In her operative complaint, Gerovic asserted additional claims, and claims against additional parties. In her response to the City Defendants' motion for summary judgment, however, Gerovic indicated that she did not object to the dismissal of those claims. Therefore, the district court's dismissal of the following claims is not on appeal: (1) Gerovic's claims against defendants Robinson and O'Neil; (2) Gerovic's §§ 1981 and 1983 claims against the City (Counts III and IV); and (3) Gerovic's claim for violation of the Family Medical Leave Act against the City (Count V). Additionally, Gerovic does not challenge the district court's grant of summary judgment as to her § 1981 claim against the HSS Defendants on appeal. Accordingly, we do not address any of these claims here.

[10] In Gerovic's operative complaint, she captioned Claim I as "Title VII Race and Color Discrimination," and she did not assert a cause of action for "Title VII

(Cont'd)

12

The district court granted the City Defendants' and the HSS Defendants' motions for summary judgment as to all of Gerovic's claims, including Gerovic's national origin claim.

Gerovic subsequently moved to alter or amend the district court's grant of summary judgment as to her Title VII retaliation claims. However, the district court denied that motion.

Gerovic filed a timely notice of appeal.

## II.    STANDARD OF REVIEW

This court reviews a grant of summary judgment de novo, applying the same legal standard used by the district court under Federal Rule of Civil Procedure 56(a). *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 997 (10th Cir. 2011). We affirm if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1141 (10th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). "A fact is 'material' if under the substantive law it could have an effect on the outcome of the lawsuit. An issue is 'genuine' if a 'rational jur[or] could find in favor of the nonmoving party on the evidence presented.'" *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (alteration in original) (citation omitted) (quoting *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000)). "The

---

National Origin Discrimination." Aplt. App., Vol. I at 33. Although Gerovic's operative complaint stated that Gerovic "was of Bosnian ethnicity and ancestry," it did not include any references to her country of origin. *Id.* at 22.

evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.    ANALYSIS

On appeal, Gerovic argues that the district court erred by (1) granting the City Defendants' motion for summary judgment as to her Title VII, §§ 1981 and 1983 race- and national origin-based discriminatory discharge claims, and retaliatory discharge claims; and (2) granting the HSS Defendants' motion for summary judgment as to Gerovic's § 1983 claims.  For the reasons that follow, we reject Gerovic's arguments and conclude that the district court properly granted summary judgment in favor of the City Defendants and the HSS Defendants.

### A. Reverse Race Discrimination Claims Against the City Defendants

The district court granted summary judgment to the City Defendants on Gerovic's reverse race discrimination claims on two grounds.  First, the district court concluded that Gerovic failed to establish a prima facie case because she did not submit sufficient evidence to establish a reasonable probability that she would not have been fired were she not a non-Hispanic Caucasian.  Second, the district further concluded that Gerovic failed to show that the City Defendants' stated reasons for firing her were pretextual.

We need not decide whether the district court erred in determining that Gerovic failed to establish a prima facie case of discrimination.  Rather, we conclude that, even if Gerovic did establish a prima facie case, her racial discrimination claims could not survive summary judgment because she cannot show that the City's

14

proffered reasons for her termination were pretextual.  Accordingly, we affirm the district court's grant of summary judgment based on Gerovic's failure to establish pretext.

### 1.  *Legal Background*

#### i.  *McDonnell Douglas* **framework**

Gerovic alleges that the City Defendants discriminated against her in violation of Title VII, § 1981, and § 1983.[11]  Regardless of whether Gerovic's claims are brought pursuant to Title VII, § 1981, or § 1983, however, "the elements of a discrimination lawsuit are the same."  *Fulcher v. City of Wichita*, 387 F. App'x 861, 864 (10th Cir. 2010); *see Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225–26 (10th Cir. 2000) (applying the *McDonnell Douglas* framework to § 1981 and § 1983).

"When alleging disparate treatment on the basis of [race or national origin], the plaintiff must prove by a preponderance of the evidence that the defendant had a discriminatory motive or intent."  *Sorensen v. City of Aurora*, 984 F.2d 349, 351 (10th Cir. 1993).  Since Gerovic "lacks direct evidence of intentional discrimination," she "may use the burden-shifting framework" articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), "to demonstrate intentional discrimination" using circumstantial evidence.  *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1191.

---

[11] Gerovic also raises claims of discrimination based on her national origin. We address Gerovic's national origin claims separately in Section III.C.

Under *McDonnell Douglas*, Gerovic must first establish a prima facie case of discrimination. 411 U.S. at 802. If she succeeds in doing so, then the burden shifts to the City Defendants "to rebut the presumption of discrimination" by "producing some evidence that it had legitimate, nondiscriminatory reasons for the decision." *Sorensen*, 984 F.2d at 352 (internal quotation marks omitted). The City's articulation of its legitimate, nondiscriminatory reasons for its employment decision "must be clear and reasonably specific." *Drake v. City of Fort Collins*, 927 F.2d 1156, 1160 (10th Cir. 1991). If the City Defendants "succeed[] in rebutting the presumption of discrimination raised by plaintiff's prima facie case, then . . . . the plaintiff must prove by a preponderance of all the evidence in the case that the legitimate reasons offered by the defendant[s] were a pretext for discrimination." *Sorensen*, 984 F.2d at 352. "The ultimate burden of persuading the trier of fact that the defendant[s] intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988).

### ii. Reverse Discrimination Claim

Gerovic alleged in her complaint that the City Defendants discriminated against her based on her race and color. Because Gerovic is Caucasian and not a member of a minority of a historically disfavored group, her claim is one for reverse race and color discrimination. *Lyons v. Red Roof Inns, Inc.*, 130 F. App'x 957, 963 (10th Cir. 2005); *Livingston v. Roadway Express, Inc.*, 802 F.2d 1250, 1251 (10th Cir. 1986).

16

In a reverse discrimination case, a plaintiff "must, in lieu of showing that [s]he belongs to a protected group, establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006) (internal quotation marks omitted). "Alternatively, a plaintiff may produce facts sufficient to support a reasonable inference that but for plaintiff's status the challenged decision would not have occurred." *Id.* (internal quotation marks omitted). Here, Gerovic acknowledges that the "but for" standard applies to her burden to establish a prima facie case, and she argues that there is a reasonable probability that she would not have been fired were she not "of Caucasian origin and non-Hispanic." Aplt. App., Vol. III at 134–35.

### 2. *Analysis*

Although the district court concluded that Gerovic failed to establish a prima facie case under the first step of the *McDonnell Douglas* analytical framework, we need not reach this issue here. Rather, we assume without deciding that Gerovic has established a prima facie case of racial discrimination, in light of the fact that the "burden of establishing a prima facie case . . . by a preponderance of the evidence" is "not onerous."[12] *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 922 (10th Cir. 2001) (internal quotation marks omitted).

---

[12] We have previously affirmed a grant of summary judgment based on an employee's failure to show pretext after assuming without deciding that the employee has stated a prima facie case. *See, e.g.*, *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316

(Cont'd)

17

Turning to the second step of the *McDonnell Douglas* framework, we conclude that the City articulated legitimate, non-discriminatory reasons for terminating Gerovic's employment. As the City noted in Gerovic's Notification of Dismissal, Gerovic violated multiple Career Service Rules, including Rule 16-29(D) prohibiting "[a]ny act of dishonesty,"[13] and she falsely identified herself as a Denver Police Officer on her public Facebook profile. Aple. App., Vol. I at 194. Additionally, the dismissal letter noted that Gerovic told other falsehoods surrounding these posts and other incidents, failed to follow protocols, and was disruptive in the workplace. These explanations constitute legitimate, non-discriminatory reasons for Gerovic's termination. *See, e.g.*, *Murray v. City of Sapulpa*, 45 F.3d 1417, 1421 (10th Cir. 1995) (noting that employees' violations of rules and regulations constituted nondiscriminatory reasons for their terminations).

Under the third step of the *McDonnell Douglas* framework, the burden shifts back to Gerovic to establish a genuine issue of material fact that the reasons offered by the City were pretextual. Although Gerovic offers several arguments in support of her assertion that she established pretext, none of these arguments are persuasive.

---

(10th Cir. 2017) (resolving the employee's claims based on her failure to show pretext, and "assum[ing] without deciding that [the employee] could make a prima facie *McDonnell Douglas* showing of sex discrimination and retaliation").

[13] Gerovic's Notification of Dismissal also noted that she had received a written reprimand for dishonesty four months earlier (in connection with the DMV incident).

18

### i. The City Defendants' Treatment of Gerovic's Facebook Activity as a Serious Offense

First, Gerovic asserts that the City Defendants "exaggerated the seriousness of the Facebook posts, and fabricated or exaggerated misconduct by Gerovic, as pretext to discharge her for retaliatory or discriminatory reasons." Aplt. Br. at 44–45. Despite Gerovic's assertions, she has not presented any evidence aside from her own subjective belief that the City exaggerated the serious nature of her misconduct. To the contrary, the City's investigation into Gerovic's Facebook profile revealed that Gerovic received serious and supportive comments in response to her photographs, and at least one individual appeared to believe Gerovic was a police officer. Aple. App., Vol. I at 123, 183–84. Gerovic's subjective belief that the City exaggerated its response to her misconduct is insufficient to demonstrate pretext.

Here, the dismissal letter clearly outlined the reasons why the City viewed Gerovic's misconduct as serious in nature. Among other things, the City stressed to Gerovic that "[f]alsely identifying yourself to the public as a police officer . . . . can create public confusion regarding your role, responsibilities[,] and duties," and "[i]t can also be dangerous to you and the public, should someone need police assistance or intervention and come to you for help." Aple. App., Vol. I at 197–98. Additionally, the City noted that *regardless* of whether Gerovic was misrepresenting herself as a police officer "as a joke or to impress others," her conduct was "not only deceitful, but could be perceived as impersonating a police officer, which is a serious offense." *Id.*

19

Moreover, this was not the first time Gerovic was warned about misrepresenting herself as a police officer.  In 2015, she had received a "verbal warning" for wearing a DPD sweatshirt while on duty, and she was advised that it could cause problems if she were misidentified as a police officer.[14]  *Id.* at 197. Gerovic's prior warning demonstrates that the City has consistently taken the position that misrepresenting oneself as a police officer—whether intentionally or unintentionally—raises serious concerns and warrants discipline.  Accordingly, the evidence in the record would allow a jury to find that the City honestly believed that an employee misrepresenting herself as a police officer constitutes serious misconduct, and that the City acted in good faith upon those beliefs.  *Luster v. Vilsack*, 667 F.3d 1089, 1094 (10th Cir. 2011) ("The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." (internal quotation marks omitted)).

### ii.  Credibility Determinations Regarding Gerovic's Prior Incidents of Misconduct

Next, Gerovic contends that the district court "improperly assumed disputed facts about [Gerovic's] 'less serious misconduct' in favor of the City Defendants,

---

[14] The dismissal letter also notes that, when Gerovic received a verbal warning in 2015 for wearing a gray DPD sweatshirt during the workday, she "stated [she] wore it because [she was] so proud to work for the DPD."  Aple. App., Vol. I at 197. According to the letter, Lemos then "clarified to [Gerovic] that [she] do[es] not work for [the] DPD," but rather, she was "assigned to clean a police building."  *Id.*

20

rather than in the non-movant, Gerovic's favor." Aplt. Br. at 42. In rejecting

Gerovic's pretext arguments, the district court held that

> As set forth in the City Defendants' eight-page dismissal letter, the City found [Gerovic]'s most egregious misconduct was representing herself as a police officer on Facebook, but her disciplinary history included various instances of less serious misconduct as well. [Gerovic] has not shown these reasons are unworthy of belief, and, taken together, they provide a legitimate, nondiscriminatory basis for her firing.

Aplt. App., Vol. III at 137. Gerovic "disputes that she engaged in dishonesty

surrounding her Facebook posts or other incidents," and she "disputes that many of

the events investigated by Lemos occurred as described, including the [DMV]

Incident, her failure to wear safety shoes, the 'white glove' inspection of areas

assigned to Gerovic, and her use of her cell phone." Aplt. Br. at 42–43.

Additionally, Gerovic disputes "that any comments she made about other employees

were negative and disruptive," and she contends that she "submitted numerous

instances where she was praised by her coworkers, . . . raising questions as to the

seriousness of her alleged 'disruptive' behavior." *Id.* According to Gerovic, "such

questions of credibility should have been reserved for the trier of fact." *Id.*

This argument also fails. As the district court correctly noted, "[c]onsidering

the facts as they appeared to the City at the time she was fired, [Gerovic] has not

shown that [the City's] stated reasons for firing her were not honestly held." Aplt.

App., Vol. III at 138. "The pertinent question in determining pretext is not whether

the employer was right to think the employee engaged in misconduct, but whether

21

that belief was genuine." *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1119 (10th Cir. 2007) (internal quotation marks and brackets omitted).

Here, Gerovic's subjective beliefs about her own job performance do not raise a genuine issue of material fact regarding the City's stated reasons for her termination. *See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1179 (10th Cir. 2006). To show pretext, Gerovic must produce evidence that the City shifted rationales; that the proffered justification was false, incoherent, or contradictory; or that similarly-situated employees were treated differently. *See Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1197 (10th Cir. 2011). However, Gerovic has not produced any evidence that Williamson or Lemos (assuming he was involved in the termination decision) shifted rationales at any point between when the City began investigating Gerovic's conduct and when Gerovic was terminated. Additionally, Gerovic has not produced evidence that Williamson or Lemos did not actually believe Gerovic was dishonest, or that either of them ever contradicted their statements that Gerovic was dishonest.

### iii. Human Resources Email Regarding the City's Response to Employee Misconduct Outside the Workplace

Gerovic also attempts to establish pretext by citing to an email from the City's former Human Resources representative, Christina Howard. According to Gerovic, Howard's email states that the City's "ordinary response to an employee apparently misrepresenting the nature of their employment with the City in a Facebook profile would be to 'clarify expectations' and not to terminate the employee." Aplt. Br. at

23–24. However, Gerovic broadly overgeneralizes Howard's message and takes her words out of context. The full text of Howard's email, in pertinent part, is below:

> As for city protocol I wouldn't think [this] is much different . . . than city employees['] activities outside of work—which can sometimes reflect in their work environment. Often it is enough to let the employee know it has come to our attention and clarify expectations. In this instance, [there is] some concern as the employee list[s] DPD as an employer and is misrepresenting their role.

Aplt. App., Vol. III at 99. Howard's email says nothing about "the City's ordinary response." Aplt. Br. at 23. Additionally, Howard's email does not address whether an employee could be terminated in this situation, or whether an employee could be terminated for violating the Career Service Rule prohibiting dishonesty, especially for the second time.

Moreover, Howard's email discusses employees who committed misconduct "outside of work," whereas it is undisputed that Gerovic's Facebook photographs were taken at work, in various locations throughout the PAB. Aplt. App., Vol. III at 99. Howard also noted that "activities outside of work . . . can sometimes reflect in [the employee's] work environment," but here Gerovic's activities directly implicate her role at the DPD. *Id.* Not only does Gerovic's Facebook profile state that she works as a "Police Officer" at the "Denver Police Department," but each of the photographs at issue also feature the DPD emblem or badge in some fashion. Aple. App., Vol. I at 180–182.

Gerovic also fails to mention the key sentence in Howard's email where she states that, "[i]n this instance, [there was] some concern as the employee list[ed]

23

DPD as an employer and [was] misrepresenting [her] role." Aplt. App., Vol. III at 99. This statement suggests that Howard viewed Gerovic's situation as more serious than other situations involving employees' activities that occurred outside of work, and that perhaps it would not be enough to simply notify Gerovic and "clarify expectations."[15] *Id.*

### iv. Lemos's Alleged Racial Bias Against Non-Hispanic Employees

In support of her argument that she has established pretext, Gerovic contends that she "submitted evidence from which a reasonable juror could conclude that Lemos was biased against white people." Aplt. Br. at 43. Additionally, Gerovic asserts that a reasonable juror could conclude that "Lemos effectively controlled the investigation and discipline of Gerovic for the 'misconduct' that [the City] identified as bases for her dismissal." *Id.*

This argument fails for several reasons. To begin, Gerovic has not included any citations to the record to support the proposition that Lemos "controlled or substantially contributed to the investigation and ultimate decision to terminate her."

---

[15] As we noted earlier, Gerovic had previously been warned about misrepresenting herself as a police officer, even before the City Defendants discovered her Facebook profile. Gerovic's dismissal letter notes that, when she received a verbal warning in 2015 for wearing a gray DPD sweatshirt during the workday, she "stated [she] wore it because [she was] so proud to work for the DPD." Aple. App., Vol. I at 197. According to the letter, Lemos then "clarified to [Gerovic] that [she] do[es] not work for [the] DPD," but rather, she was "assigned to clean a police building." *Id.* This incident further undermines Gerovic's argument that the City's response to her Facebook profile should have been to "clarify expectations," as the City had already done so.

*Id.* at 31.  Rather, the record reflects that termination decisions were outside the scope of Lemos's authority.

Although Gerovic acknowledges that Williamson made the "formal" decision to terminate her, she contends that Williamson told her in May 2017 that he "could do nothing and that it was Lemos who made the decision." *Id.* at 31 (citing Aplt. App., Vol. II at 117, 134).  During this May 2017 discussion, however, Williamson's reference to Lemos's "decision" refers to Gerovic's *written reprimand* (in connection with the DMV incident), not her *termination*.  Aplt. App., Vol. II at 134, 159–60, 162.  In fact, Williamson could not possibly have been referencing Gerovic's termination, because she was not terminated until several months later, in November 2017.[16]

Gerovic also alleges that "Lemos personally conducted the investigations of many of the incidents that served as the stated bases for Gerovic's dismissal, including the [DMV] building incident, the Facebook posts, and Gerovic's alleged personal use of her work cell phone." Aplt. Br. at 31–32.  However, Lemos's investigations regarding Gerovic's cell phone usage and her misconduct at the DMV

---

[16] Similarly, Gerovic overgeneralizes the record when she asserts that "O'Neil testified that the ultimate decision by Williamson relied on information provided by Lemos." Aplt. Br. at 31.  In the pages of O'Neil's testimony that Gerovic cites to, however, O'Neil was not specifically referencing Williamson's decision to *terminate* Gerovic's employment.  Aplt. App., Vol. III at 35–37.  Rather, O'Neil was referencing the administration of discipline in general.  Additionally, O'Neil specifically stated that, when administering discipline, Williamson would also rely on "other information" in addition to any information provided by Lemos.  *Id.* at 36–37.

building did not result in her termination.  These incidents resulted in a documented counseling and a written reprimand, respectively.

Although Gerovic suggests that Lemos's review of her Facebook posts was tainted by his discriminatory animus, she does not raise any specific allegations about how Lemos's discriminatory animus affected his review.  For example, Gerovic does not allege that Lemos instigated the review of Gerovic's Facebook profile; rather, Forsberg, a City employee, was notified about Gerovic's Facebook profile from her daycare provider.  Additionally, the parties do not dispute that Gerovic's Facebook profile misstated Gerovic's job title and place of employment, and that Gerovic did, in fact, post (or request assistance in posting) the photographs at issue.

Gerovic also contends that "Lemos repeatedly disregarded her complaints of harassment by Hispanic employees."  Aplt. Br. at 31 (citing Aplt. App., Vol. II at 127, 152).  However, the cited pages of the record do not support this proposition.  *See* Aplt. App., Vol. II at 152 (Gerovic's testimony that Lemos "don't want to listen to me" and said "it's my fault").  Additionally, Gerovic contends that she testified that she "told Williamson that Lemos was harassing her because she was not Hispanic."  Aplt. Br. at 31 (citing Aplt. App., Vol. II at 117, 134).  Here, too, the cited pages of the record do not contain this testimony.  *See* Aplt. App., Vol. II at 134 (Gerovic's testimony that she "had a meeting with" Williamson, and he told her that "he can do nothing" and "Leroy Lemos make decision").

Finally, Gerovic claims that Lemos is "demeaning to non-Hispanic Caucasians in general."  Aplt. Br. at 31.  In support of this allegation, she relies on Facebook

26

graphics that Lemos reposted on his Facebook page, which Gerovic contends

demonstrate an animus towards Caucasian people. *See* Aplt. App., Vol. III at 47–49

(screenshots of Lemos's Facebook posts). Gerovic's argument is unconvincing.

Lemos's Facebook posts do not denote animus; they simply reflect his own personal

views on police unions and the Black Lives Matter protests that occurred during the

summer of 2020. *See* Aple. App., Vol. II at 76 (Lemos's testimony about his intent

behind his Facebook posts). Moreover, Lemos's Facebook posts were made years

after Gerovic's termination, and they clearly do not relate in any way to her

termination.

### v. Gerovic's Treatment Compared to Hispanic Employees

Finally, Gerovic attempts to establish pretext by offering comparisons to

Hispanic individuals who she claims were similarly situated to her yet were treated

differently. According to Gerovic, these Hispanic individuals "were not disciplined

for acts similar to those for which [she] was purportedly fired." Aplt. Br. at 24.

A plaintiff can establish pretext by showing that similarly situated employees

were treated differently. *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177,

1181 (10th Cir. 2002). To demonstrate disparate treatment, Gerovic must establish

that "she was similarly situated to [her comparators] in all relevant respects."

*McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006). In determining

whether two employees are similarly situated, a "court should also compare the

relevant employment circumstances, such as work history and company policies,

applicable to the plaintiff and the intended comparable employees." *Id.* (internal

quotation marks omitted).  Moreover, even employees who are similarly situated must have been disciplined for conduct of "comparable seriousness" for their disparate treatment to be relevant.  *Kendrick*, 220 F.3d at 1230.  Gerovic has the burden to show she is similarly situated to the employees with whom she is comparing herself.  *Watts v. City of Norman*, 270 F.3d 1288, 1293 (10th Cir. 2001). Here, none of these employees that Gerovic has proffered are similarly situated comparators.

### a.  Proposed Comparators

### (i) Ms. Viola Chacon

First, Gerovic compares herself to Viola Chacon, a Hispanic custodian. Gerovic contends that Ms. Chacon "merely received a 10-day suspension, instead of a termination, despite stealing a plant from the workplace and then lying about it." Aplt. Br. at 24.  As an initial matter, Gerovic overlooks the fact that Ms. Chacon's incident regarding the plant was her *first* act of dishonesty.

Moreover, the district court reasonably concluded that Ms. Chacon's misconduct—"stealing a plant from the workplace"—is "factually distinct from the misconduct that primarily prompted [Gerovic's] firing—representing herself as a police officer on Facebook."  Aplt. App., Vol. III at 135.  Whereas the City's concerns regarding Gerovic's misconduct were motivated by important concerns such as public safety, Ms. Chacon's misconduct in stealing a plant from the workplace did not implicate concerns of this same magnitude.  Finally, the City ultimately

*terminated* Ms. Chacon for a subsequent dishonesty violation.  In doing so, the City

acted in a manner that was consistent with its response to Gerovic's Facebook posts.

### (ii) Ms. Danielle Garcia

Next, Gerovic compares herself to Danielle Garcia, a Hispanic employee who

worked for the Utility Department.  Gerovic contends that Ms. Garcia was demoted,

rather than terminated, in response to "being rude to a customer and pointing her

middle finger at her."[17]  Aplt. Br. at 24.  However, Ms. Garcia cannot serve as a

proper comparator because Ms. Garcia was not a custodian, she worked for a

different department, and she worked under a different supervisor.  Additionally,

Ms. Garcia had been employed for a substantially longer period of time, as she was

originally hired in 2005.  Ms. Garcia also received less prior discipline than Gerovic

did; at the time of her demotion, Ms. Garcia had only received one verbal reprimand.

Finally, unlike Gerovic, Ms. Garcia was demoted for misconduct that did not include

a dishonesty violation.

### (iii) Ms. Teresa Luyando

Gerovic also compares herself to Teresa Luyando, a Hispanic custodian.

Gerovic contends that Ms. Luyando "received four or five writeups, including one for

having her shirt completely unbuttoned, and was the object of many complaints about

---

[17] In her opening brief, Gerovic falsely states that Ms. Garcia was only given a "short suspension pay cut," Aplt. Br. at 24, despite previously admitting elsewhere that Ms. Garcia was, in fact, demoted.  Aple. App., Vol. II at 122; *see id.* at 74–75, 86, 92.  The record reflects that Ms. Garcia was demoted from the position of Utility Worker to custodian.  *Id.* at 122 (noting that Ms. Garcia received a Notification of Involuntary Demotion Disciplinary Action on June 2, 2017).

fighting with people and yelling at people, but was not fired." Aplt. Br. at 24. This comparison is also unpersuasive. As an initial matter, Gerovic has failed to provide any evidence to support her allegations regarding Ms. Luyando's conduct, aside from her own speculation and hearsay, and her testimony that she viewed one disciplinary write up that Ms. Luyando received. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (noting that "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings," and "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."). Additionally, Ms. Luyando was employed for a substantially longer period of time than Gerovic, as Ms. Luyando worked for the City for 15 or 20 years. Moreover, there is no evidence that Ms. Luyando was dishonest on more than one occasion.

### (iv) Mr. David Chavez

According to Gerovic, Hispanic custodian David Chavez "received starting pay of $0.50 an hour more than Gerovic was paid at that time." Aplt. Br. at 25. However, Gerovic overlooks Mr. Chavez's employment history; at the time that Mr. Chavez was hired by the City, he had been a Facilities Manager at Denver Public Schools for twenty-two years. Mr. Chavez and Gerovic are therefore not similarly situated, as Mr. Chavez had significantly more relevant experience than Gerovic which would justify any alleged difference in pay.

### (v) Mr. John Gandara

Gerovic also argues that she "was disciplined . . . for not wearing safety shoes, while at the same time another Hispanic worker, John Gandara, was not disciplined

for the same offense." *Id.* However, Gerovic has failed to provide any evidence, aside from her own conjecture, to support this allegation and establish Mr. Gandara as a similarly situated comparator.

### (vi) Ms. Yvonne Chavez and Ms. Sharon Romero

Lastly, Gerovic contends that "Yvonne Chavez, a Hispanic custodial supervisor, and Sharon Romero, also Hispanic, were permitted to harass Gerovic without consequence, despite Gerovic's unheeded complaints to Lemos." *Id.* at 24–25. Specifically, Gerovic contends that Ms. Chavez performed a "white glove" inspection of Gerovic's floor and stairs in the PAB, but that Ms. Chavez did not do the same for Hispanic custodians. *Id.* at 25. Additionally, Gerovic asserts that Ms. Romero was "harassing [her] about the trash in [the] parking lot." Aple. App., Vol. I at 81. Gerovic's allegations regarding Ms. Chavez and Ms. Romero are unsupported by any evidence aside from Gerovic's own conjecture.

### b. Discipline Histories and Supervisors of Proposed Comparators

Gerovic has failed to establish that any of these employees constitute similarly situated comparators for an additional reason: she has not provided the discipline histories of the employees in question or the identities of their supervisors. The district court correctly observed that "this obviously pertinent information" was "needed to make a proper comparison." Aplt. App., Vol. III at 135.

First, Gerovic contends that she was not required to provide the discipline histories of her comparators. However, we have held that similarly situated

comparators must be subject to the "same standards governing performance evaluation and discipline." *Kendrick*, 220 F.3d at 1232 (internal quotation marks omitted).

Second, Gerovic asserts that she was not required to identify the supervisors of her comparators. Contrary to Gerovic's assertions, however, we have held that to be "similarly situated" to the plaintiff, a comparator must "share[] *the same* supervisor" or decision maker.[18] *E.E.O.C. v. BCI Coca–Cola Bottling Co. of L.A.*, 450 F.3d 476, 489 (10th Cir. 2006) (emphasis added). This requirement is a logical one, as "[d]ifferences in disciplinary decisions 'may be explained by the fact that the discipline was administered by different supervisors, or that the events occurred at different times when the company's attitudes toward certain infractions were different.'" *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 540 (10th Cir. 2014) (quoting *E.E.O.C. v. Flasher Co.*, 986 F.2d 1312, 1320 (10th Cir. 1992)).[19]

---

[18] Gerovic cites to *Kimble v. Wis. Dep't of Workforce Dev.*, 690 F. Supp. 2d 765 (E.D. Wis. 2010), to support her position that similarly situated comparators need not work for the same supervisors. We are unpersuaded by Gerovic's attempt to rely on an out-of-circuit case, especially when this case directly conflicts with the established authority in our circuit.

[19] Even if Gerovic was able to demonstrate differential treatment of similarly situated employees, Gerovic would still face an uphill battle in her attempt to establish pretext. We have held that, when a plaintiff "attempts to show pretext through evidence of differential treatment[,] if the employer's differential treatment of similarly-situated employees is 'trivial or accidental or explained by a nondiscriminatory motive,' such treatment is insufficient to create an inference of discrimination." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007) (quoting *Kendrick*, 220 F.3d at 1232). Here, Gerovic provides no evidence, beyond her own subjective belief, to demonstrate that an unlawful,

(Cont'd)

\* \* \*

In sum, we conclude that Gerovic has failed to demonstrate a genuine dispute of material fact regarding whether the City Defendants' asserted reasons for Gerovic's termination were a pretext for discrimination. *See Debord v. Mercy Health Sys. of Kan., Inc.*, 860 F. Supp. 2d 1263 (D. Kan. 2012), *aff'd*, 737 F.3d 642 (10th Cir. 2013) (no pretext where employer terminated employee based on her Facebook posts, which contained inflammatory remarks about her supervisor, and the employee initially denied making those posts).  Accordingly, we conclude that the district court properly granted summary judgment as to Gerovic's discrimination claims against the City Defendants based on her failure to demonstrate pretext, and we affirm the district court's grant of summary judgment on this basis.

## B.  Retaliation Claims Against the City Defendants

The district court granted summary judgment to the City Defendants on Gerovic's retaliation claims on two grounds.  The district court first concluded that Gerovic failed to establish a prima facie case because she did not submit sufficient evidence of a causal connection between her alleged protected activity and her termination.  Additionally, the district court further concluded that Gerovic failed to show that the City Defendants' stated reasons for firing her were pretextual.

We assume without deciding that Gerovic established a prima facie case of retaliation.  Instead, we move directly to pretext and conclude her retaliatory

anti-Caucasian motive was responsible for any alleged difference in treatment between herself and any of the Hispanic employees she cites as comparators.

33

discharge claims could not survive summary judgment because she cannot show that the City's proffered reasons for her termination were pretextual.

### 1. *Legal Background*

Gerovic's retaliation claims are also assessed under the burden-shifting framework set forth in *McDonnell Douglass*. *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1225 (10th Cir. 2008).

### 2. *Analysis*

To establish a prima facie case of retaliation, a plaintiff must show: (1) she engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) there is a causal connection between the protected activity and the materially adverse action. *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006). Here, Gerovic alleges that she engaged in protected activity because "she complained about racial discrimination a number of times without any action being taken." Aplt. App., Vol. III at 139 (internal quotation marks omitted). As for the first element of a prima facie retaliation claim, the district court "assume[d] that [Gerovic] engaged in some protected activity by complaining about . . . Lemos 'treating her differently because she was not Hispanic and constantly harassing her.'"[20] *Id.* As for the second

---

[20] The City Defendants note that they "did not dispute this element solely for purposes of summary judgment." Aple. Br. at 39 n.14. According to the City Defendants, "all the testimonial and documentary evidence in this action (with the exception of Gerovic's testimony) demonstrates that she did not report that Lemos was treating her unfairly *because of her race/color*." *Id.*

element, the parties do not dispute that Gerovic's termination was materially adverse. As for the third element, however, the district court concluded that Gerovic failed to present evidence linking her firing with any protected activity.

We will assume without deciding that Gerovic has established a prima facie case of retaliation and turn to the second step of the *McDonnell Douglas* framework. In that regard, we have already determined that the City established legitimate, non-discriminatory reasons for terminating Gerovic's employment. *See supra* Section III.A.2. Therefore, we proceed to the third step of the *McDonnell Douglas* framework, where the burden shifts back to Gerovic to establish a genuine issue of material fact that the reasons offered by the City for her termination were pretextual.

Gerovic relies on largely the same evidence and arguments to show pretext for both her discrimination claims and her retaliation claims. Our previous discussion of Gerovic's failure to establish pretext for discrimination, therefore, applies in full force here. *See supra* Section III.A.2. For the same reasons we concluded that Gerovic failed to establish pretext for discrimination, we conclude that Gerovic also failed to establish pretext for retaliation.

None of Gerovic's arguments convince us to the contrary. As we explained previously, we are unpersuaded by Gerovic's arguments that she has established pretext with evidence that (1) the City Defendants exaggerated the serious nature of her misconduct; (2) the City Defendants deviated from their ordinary response to employee misconduct occurring outside of the workplace; (3) Lemos was racially biased against non-Hispanic employees; and (4) Gerovic received differential

35

treatment compared to non-Hispanic employees. Additionally, for the reasons discussed earlier, we rejected Gerovic's argument that the district court made improper credibility determinations relating to Gerovic's prior incidents of misconduct.

The only other evidence of pretext which Gerovic offers is the temporal proximity of her protected activity and her termination. According to Gerovic, the short window of time between her protected activity and her termination "support[s] an inference of retaliatory motive." Aplt. Br. at 40. Granted, Gerovic raises the issue of temporal proximity in the context of her prima facie case of retaliation— specifically, she contends that temporal proximity establishes the requisite causal connection. However, because we have stated that "close temporal proximity is a factor in showing pretext," we briefly address Gerovic's temporal proximity argument in the context of our pretext analysis. *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240 (10th Cir. 2004).

Gerovic alleges that she complained to Williamson about Lemos in May 2017, which is approximately six months before her November 27, 2017, termination. Gerovic also alleges two other instances of protected activity in support of her argument that temporal proximity supports an inference of retaliatory motive.[21] First, Gerovic claims that she engaged in protected activity by "complaining to Anne Carter about Lemos treating her differently because she was not Hispanic and constantly

---

[21] The City Defendants note that they "dispute[] the facts relied on by Gerovic" regarding these two alleged instances of protected activity. Aple. Br. at 41.

harassing her" in "September and October of 2017." Aplt. Br. at 38. Second, she asserts that, on September 20, 2017, Commander Ron Thomas of the DPD sent an email to Robinson on Gerovic's behalf "raising the issue of unfair treatment." *Id.*

Although temporal proximity can potentially support a finding of pretext, we have consistently held that "temporal proximity alone is not sufficient to defeat summary judgment by showing that the employer's proffered reason is actually pretext for retaliation." *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1066 (10th Cir. 2009); *see also Medina v. Income Support Div., N.M.*, 413 F.3d 1131, 1138 (10th Cir. 2005) ("No reasonable jury could conclude that a five-week span of time[,] . . . without more, meets this standard."). In other words, "close temporal proximity can support a finding of pretext only in combination with *other evidence* of pretext." *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1293 (10th Cir. 2013) (emphasis added). Because we have determined that Gerovic is otherwise unable to establish pretext, temporal proximity alone cannot establish pretext, either. !

In sum, we conclude that Gerovic has failed to demonstrate a genuine dispute of material fact regarding whether the City Defendants' asserted reasons for Gerovic's termination were a pretext for retaliation. Accordingly, we conclude that the district court properly granted summary judgment as to Gerovic's retaliation claims against the City Defendants based on her failure to demonstrate pretext, and we affirm the district court's grant of summary judgment on this basis.

**C. National Origin Claims Against the City Defendants**

We now turn to Gerovic's national origin-based discrimination claims against the City Defendants. The district court granted summary judgment to the City Defendants on these claims because, among other reasons, Gerovic failed to exhaust her administrative remedies by raising a national origin discrimination claim in her EEOC complaint. Despite Gerovic's arguments to the contrary, we conclude that the district court properly determined that Gerovic failed to administratively exhaust her national origin claims.

**1.  *Legal Background***

Under Title VII, a plaintiff's failure to exhaust her federal claims enables an employer to raise lack of exhaustion as an affirmative defense. *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1185 (10th Cir. 2018). "[A] plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." *Jones v. United Parcel Serv., Inc.*, 502 F.3d 1176, 1186 (10th Cir. 2007) (internal quotation marks omitted).

**2.  *Analysis***

Here, Gerovic concedes that she did not check the "national origin" box on her EEOC charge of discrimination. She relies instead on the supplemental description that she attached to her EEOC charge, which states that she "is a naturalized US citizen who arrived in America after enduring many years of war in her birthplace, Bosnia-Herzegovina." Aplt. App., Vol. III at 113. Additionally, Gerovic points out

that "[t]here is no mention of [her] non-Hispanic status in either of the first two paragraphs." Aplt. Br. at 33. In Gerovic's view, therefore, "a reasonable interpretation of the paragraphs is that the discriminatory behavior resulted from her country of origin." *Id.*

This argument is unavailing. Contrary to Gerovic's assertions, the EEOC could reasonably view these statements about Gerovic's citizenship and birthplace as background information in the introduction of her supplemental description. The single reference to Gerovic's national origin in the attachment to her EEOC charge does not provide the EEOC with any information about when Gerovic became a U.S. citizen, or whether the City had any knowledge of her birthplace.

Gerovic also contends that her charge describes a national origin claim because it states her belief that Lemos has a "pattern of disciplining employees under him more harshly when the employee is *not Latino*." Aplt. Br. at 33 (internal quotation marks omitted) (quoting Aplt. App., Vol. III at 115). We are unpersuaded. As the City Defendants correctly note, "[i]t is unclear how '*not Latino*' is related to Bosnians in particular and not Serbians, Romanians, Croatians, Bulgarians, Hungarians, Russians," or a host of other national origins. Aple. Br. at 34. In other words, Gerovic's assertion that she was discriminated against because she was *not Latino* did not provide the City with notice of a national origin claim based on Gerovic being *Bosnian*.

In sum, the statements that Gerovic relies on in her charge are insufficient to cause the EEOC to investigate a national origin claim. As the district court correctly

39

noted, "[t]he EEOC complaint, like the Complaint in this case, is devoid of any allegations that [Gerovic] was treated differently because she came from Bosnia or even that her national origin was ever mentioned or alluded to by any Defendant." Aplt. App., Vol. III at 136. Under these circumstances, it is unreasonable to expect the EEOC to widen the scope of its administrative investigation beyond race and color discrimination to also include Gerovic's national origin.[22] Accordingly, we conclude that Gerovic failed to administratively exhaust her national origin claims, and we affirm the district court's grant of summary judgment as to Gerovic's national origin claims against the City Defendants.

### D. § 1983 Claims Against the HSS Defendants

Lastly, we address Gerovic's § 1983 claims against the HSS Defendants. The district court granted summary judgment to the HSS Defendants on these claims based on its determination that the HSS Defendants were not the proximate cause of any violation of Gerovic's rights. The district court reasoned that the HSS Defendants could not have been the proximate cause because they acted as intermediaries and did not participate in the decision to issue the BOLO posters that allegedly violated Gerovic's rights. For the reasons discussed below, we conclude

---

[22] In fact, the record reflects that the EEOC did not have notice of Gerovic's national origin claims. In one of the EEOC's internal documents, a Supervisory Investigator described Gerovic's charge as "alleging that she was harassed, disciplined, retaliated against[,] and discharged from her position as a custodial worker because of her *color*, not-specified, and *race*, white." Aple. App., Vol. II at 95 (emphasis added).

40

that the district court properly granted summary judgment as to Gerovic's § 1983 claims against the HSS Defendants.

### 1. *Legal Background*

Section 1983 imposes liability on anyone who causes a constitutional deprivation while acting under color of state law. 42 U.S.C. § 1983. To establish a claim under § 1983, a plaintiff must prove: "(1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) *proximately caused* (3) by the conduct of a person (4) who acted under color of [state law]." *Beedle v. Wilson*, 422 F.3d 1059, 1064 (10th Cir. 2005) (emphasis added) (internal quotation marks and brackets omitted).

Courts employ general tort principles of causation in § 1983 cases to determine whether the alleged constitutional violation caused a plaintiff's injury. *Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012). General tort principles of causation provide that even where the defendant's conduct does not directly cause the plaintiff's injuries, the defendant can still be liable if his conduct was the "proximate cause" of the injury. *Trask v. Franco*, 446 F.3d 1036, 1046 (10th Cir. 2006). Proximate cause exists where the defendant "set in motion a series of events that the defendant[ ] knew or reasonably should have known would cause others to deprive the plaintiff of his constitutional rights." *Id.* (internal quotation marks and brackets omitted). "In order for liability to arise under § 1983, a defendant's direct personal responsibility for the claimed deprivation of a

41

constitutional right must be established." *Trujillo v. Williams*, 465 F.3d 1210, 1227 (10th Cir. 2006).

### 2. *Analysis*

Here, Gerovic contends that she submitted sufficient evidence that the HSS Defendants were the proximate cause of the violation of her constitutional rights. According to Gerovic, the HSS Defendants may be held liable for their "participation in the creation and posting of the BOLO posters," even though it is undisputed that the HSS Defendants acted at the direction of the City and lacked any discriminatory motive towards Gerovic. Aplt. Br. at 47.

We conclude the district court properly granted summary judgment as to Gerovic's § 1983 claims against the HSS Defendants. As an initial matter, it is undisputed that the HSS Defendants had no independent authority to issue the BOLO posters of Gerovic. In fact, Gerovic acknowledges that "before anyone at HSS made any decision to put out a BOLO for any employees of the City and County of Denver, the source of the BOLO, which would typically be a representative of a City department, would have to be involved." Aplt. Br. at 9. Gerovic concedes that the BOLO posters at issue were created and distributed as a result of the City's "*order* to HSS," rather than the HSS Defendants' own initiative. *Id.* (emphasis added). Moreover, the HSS Defendants did not have any input or influence regarding the City's decision to issue Gerovic's BOLO posters. Similarly, the HSS Defendants did not have any discretion to *rescind* the BOLO posters after Gerovic complained about them upon her return from administrative leave; rather, the HSS Defendants had to

wait for the City's instructions before removing the BOLO posters. Accordingly, both parties agree that the HSS Defendants were not the decision makers with respect to the posting of the BOLO posters at Gerovic's place of employment.

Not only is there no evidence that the HSS Defendants exercised any decision-making authority over Gerovic's BOLO posters, there is also no evidence that the HSS Defendants possessed any discriminatory motive toward Gerovic. In fact, as the HSS Defendants correctly note, "there is evidence suggesting that HSS took a conciliatory and understanding approach toward Ms. Gerovic," and that "Ms. Gerovic viewed HSS as confidants with respect to her dispute against the [C]ity." HSS Br. at 15. For example, the record reflects that after Gerovic learned about the BOLO posters and became "visibly upset," she went to the office of Defendant Knoedler, the Facility Security Supervisor at HSS, to share her concerns. Aplt. App., Vol. II at 13, 38. Later that same day, Knoedler sent an email to Lemos memorializing his conversations with Gerovic. Knoedler represents that he told Gerovic he "was willing [to] attest to her being in distress" about the BOLO posters, but Gerovic said that she "wanted to try and keep [Knoedler] out of the situation," and that she would raise this issue with human resources on her own. *Id.* at 39.

Not only does Gerovic fail to allege that the HSS Defendants possessed any discriminatory motive towards her, but Gerovic also appears to *concede* that the HSS Defendants, in fact, did not possess any such malintent. Specifically, Gerovic maintains that a subordinate defendant may be liable under § 1983 where they have "direct personal responsibility" for the alleged constitutional violation,

43

"notwithstanding the fact that he was acting at the direction of a third party, and there is *no evidence* that the subordinate defendant himself had discriminatory intent." Aplt. Br. at 48 (emphasis added) (internal quotation marks omitted). We disagree with Gerovic's assertion.

Gerovic has not presented any evidence that the HSS Defendants possessed a discriminatory motive toward her, or that they set in motion the events leading to the BOLO posters being issued. Under these circumstances, we conclude that the HSS Defendants could not have been the proximate cause of any violation of Gerovic's constitutional rights. The district court, therefore, properly determined that the HSS Defendants are not liable for Gerovic's § 1983 claims against them.

Gerovic's arguments to the contrary are unconvincing. Gerovic disagrees with the district court's view that a defendant without any decision-making role or discriminatory motive leading to challenged action cannot be liable under § 1983. According to Gerovic, "a defendant may have 'direct personal responsibility' for a constitutional violation that he effected, notwithstanding the fact that he was acting at the direction of a third party, and there is no evidence that the 'subordinate' defendant himself had discriminatory intent." Aplt. Br. at 48. Here, Gerovic contends that the HSS Defendants "had substantial decision-making authority in the content, presentation[,] and placement of the posters," and that these "decisions had an effect on Gerovic's rights equal to or greater than that of the simple decision by the City Defendants to create the posters in the first place." Reply Br. at 19. In

44

Gerovic's view, therefore, the HSS Defendants "bore direct personal responsibility for, and were the proximate cause of, the violation." *Id.* at 20.

The fact that the HSS Defendants carried out the City's orders to make and distribute the BOLO posters does not inevitably mean that the HSS Defendants were the *proximate cause* of the alleged constitutional violation. Here, the HSS Defendants neither set in motion the series of events leading to the issuance of the BOLO posters, nor did they know or reasonably should have known that their actions would violate Gerovic's constitutional rights.

Unlike the cases we cited in *Maestas* where subordinate employees were held liable for significantly contributing to adverse employment decisions made by others, here the HSS Defendants did not personally participate in the *decision* to issue Gerovic's BOLO posters. *Maestas v. Segura*, 416 F.3d 1182, 1191 (10th Cir. 2005). Instead, the HSS Defendants only participated in implementing *the City's decision* to do so. Although the HSS Defendants followed the City's instructions to issue the BOLO posters, this minimal level of involvement does not rise to the level required to establish proximate causation here. *See Fuqua v. City of Altus*, No. CIV-17-115-HE, 2018 WL 1702339, at *1–2 (W.D. Okla. Apr. 6, 2018) (noting that causation under *Maestas* requires "some level of formal involvement in the eventual decision" that violated the plaintiff's rights, such as "initiating an investigation, recommending the [plaintiff's] discharge, investigating [the plaintiff's] conduct, or instigating charges" (citing *Maestas*, 416 F.3d at 1191)).

45

Further, Gerovic has not pointed to any evidence that the HSS Defendants knew or should have known that creating and posting the BOLO posters might violate her constitutional rights. As the district court correctly noted, "[a]lthough the HSS Defendants had a ministerial role in implementing the City's decision, there is no evidence that they could have reasonably foreseen that the notices would violate [Gerovic's] rights." Aplt. App., Vol. III at 132; *see Lippoldt v. Cole*, 468 F.3d 1204, 1220 (10th Cir. 2006) (concluding that an assistant city attorney's conduct was a substantial factor in the violation of the plaintiffs' First Amendment rights by denying permits for an anti-abortion parade, where "[d]espite discovering that denying the parade permits for the reasons offered by the City was most likely unconstitutional," the city attorney advised the deputy police chief to sign the denial letter). Under these circumstances, where the HSS Defendants merely acted as intermediaries and did not participate in the decision to issue the BOLO posters, the district court did not err in concluding that the HSS Defendants cannot be held liable under § 1983 because the requisite causal connection had not been met.

In sum, the HSS Defendants could not have been the proximate cause of any violation of Gerovic's rights, as required for her § 1983 claims against the HSS Defendants. The parties do not dispute that the HSS Defendants did not have any input in the decision to issue Gerovic's BOLO posters, and the HSS Defendants did not possess any discriminatory motive toward her. Moreover, the record does not contain any evidence that the HSS Defendants knew or should have known that the issuance of the BOLO posters would violate Gerovic's constitutional rights.

46

Accordingly, we conclude that the district court properly granted summary judgment as to Gerovic's § 1983 claims against the HSS Defendants based on her failure to demonstrate proximate cause, and we affirm the district court's grant of summary judgment on this basis.

#### IV.    CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

Entered for the Court

Mary Beck Briscoe
Circuit Judge